# Illinois Official Reports

## Appellate Court

<hr>

### *People v. Cross*, 2019 IL App (1st) 162108

<hr>

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KERWINN CROSS, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>No. 1-16-2108 |
| Filed | December 26, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CR-14110; the Hon. Kenneth J. Wadas, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part; cause remanded for resentencing with directions. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Michael H. Orenstein, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Tasha-Marie Kelly, Assistant State's Attorneys, of counsel), for the People. |

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justice Burke concurred in the judgment and opinion.
Justice Lampkin specially concurred, with opinion.


## OPINION

¶ 1    After a jury trial, defendant Kerwinn Cross was convicted of aggravated criminal sexual assault, aggravated kidnapping, attempted sexual assault, and attempted and aggravated criminal sexual abuse and sentenced to a total of 70 years with the Illinois Department of Corrections (IDOC). All the charges concerned one victim, C.C., age 15, and occurred during one night in June 2013.

¶ 2    On appeal, defendant raises numerous claims challenging the grand jury proceedings, the jury trial, and the sentencing. In the case at bar, defendant was allowed to file three opening briefs: one original brief, plus two supplemental briefs. In return, the State was permitted to file a response brief in excess of the normal page limits and a second, additional response brief. Thus, numerous issues were raised. Our opinion addresses each one, in turn.

¶ 3    For the following reasons, we vacate defendant's conviction for aggravated criminal sexual abuse because it violates the one act, one crime rule and order the mittimus corrected accordingly. We affirm all his other convictions in this case, but we remand for resentencing for reasons explained below. In addition, we vacate his prior aggravated unlawful use of a weapon (AUUW) conviction, as well as his prior unlawful use of a weapon by a felon (UUWF) conviction, as required by our supreme court's decision in *In re N.G.*, 2018 IL 121939.

¶ 4                                BACKGROUND

¶ 5    While the charges in the case at bar related solely to an assault of C.C. on June 25, 2013, the State also called two witnesses, N.L., age 16, and L.F., age 27, who testified at trial that defendant sexually assaulted them a few days earlier, on June 22, 2013, and June 20, 2013, respectively. None of the three women knew each other, and defendant did not claim that they did. Defendant took the stand in his own defense, admitting that he had sex with all three women but asserting that the sex in all three instances was consensual. Thus, the only issue here was consent.

¶ 6    Prior to trial, the State filed a motion to admit evidence of other crimes, namely, that between 2009 and 2013, 10 other women or girls, ranging in age from 13 to 25, had accused defendant of sexual assault or abuse. In seven of these instances, the offense was reported to the police but charges were not filed. The trial court found that the State could not use six of the uncharged offenses in its case-in-chief but that this ruling could change depending on whether defendant testified and what other evidence was presented. The trial court found that the State could use in its case-in-chief the three charged cases and one of the uncharged offenses. At trial, the State presented only two, and the trial court's ruling on this motion is not at issue on appeal.

¶ 7		Since the defense argued at trial about the inconsistencies between details of the women's trial testimony and details in their earlier statements, and the State argued about the similarities in the women's experiences, we provide the details of their narratives below.

¶ 8		At trial, C.C., the 15-year old victim in the case at bar, testified that, after spending the day at an amusement park in Waukegan with her best friend, her friend's father drove the girls back to Chicago, returning them to her friend's house at around 1 a.m. on June 25, 2013. The next day, June 26, was C.C.'s sixteenth birthday. C.C.'s friend went inside the home, but C.C. walked toward a gas station to purchase snacks, carrying a bag of clothes that she had had with her at the amusement park. C.C. testified that, while she was walking to the gas station, she "got stopped" by a vehicle. A passenger in the vehicle started talking to her, asking her name and introducing himself as "Cool." The passenger, whom C.C. identified as defendant, asked her if she wanted to smoke marijuana. After saying "yes, *** it's my birthday," she entered the backseat of the vehicle, and she and defendant smoked marijuana together and she told him she "was 15 going on 16." The driver, who C.C. described as a black man with a thick beard and a bald head, drove them to a house, where defendant exited the vehicle, returning 5 or 10 minutes later. They drove to a restaurant, and defendant asked her what she wanted to eat. The driver and defendant exited the vehicle, returning with three sandwiches. After eating, they drove to another location, where the driver exited the vehicle and C.C. moved to the front passenger seat and defendant moved to the driver's seat.

¶ 9		C.C. testified that defendant drove to his house and parked, inviting her to come inside his house because he was "going to be a minute." Leaving her bag of clothes in the vehicle, C.C. exited and walked toward the house with him. C.C. left her bag in the vehicle because "the whole plan with him" was "we smoke, and he drop me back off." However, "something just told" her to ascertain where she was, so she counted six houses from the corner and they entered the sixth house. As they entered the back door of his house, C.C. heard dogs in the house. After heading up the stairs, defendant told her to go to the room on the left, which was his bedroom. They sat on the bed, talking for a while, when defendant suddenly asked if she had "ever been f*** in the a***." She felt uncomfortable and did not "want to do anything with him [like] that," so she told him no and that she had her period. Then they talked some more, and when she was talking, he said "shut up, b***" and started choking her with his hands around her neck, and she had trouble breathing. Then he started smacking her around and trying to flip her over, but she resisted that. Defendant ripped off her pants and underwear, while she screamed for help.

¶ 10		C.C. testified that he removed her tampon, placed it on a window ledge, and forced his penis into her vagina, while placing his lips all over her face. Defendant then put "his finger on [her] bootie hole," and tried to put his penis in her anus but she fought that off. C.C. testified: "I just went crazy, and I was fighting back, flipped him over the bed, and I bit his fingers." While he was trying to anally rape her, defendant said "say yes to daddy." After she bit his fingers, he took out a knife that was 6 to 10 inches long and placed it against her back. When the knife was against her back, she vomited. C.C. was screaming, and he told her "shut up, the police [are] coming" and then "we fitting to go." On their way out of the house, C.C. grabbed a red jacket out of his room that was not hers because she was wearing only a shirt and was naked from the waist down. So she wrapped the jacket around her waist.

¶ 11		C.C. testified that defendant still had the knife out, and he took her and "put" her in his vehicle. After driving around a few blocks, defendant stopped his vehicle in front of a church

and said "get out, b***," while pushing her out of the vehicle. C.C. fell out of the vehicle, landing on the ground and injuring her knee and her foot. Then she jumped back into the vehicle, hit defendant twice, grabbed her bag from the backseat and jumped back out. When asked why she went back into the vehicle for her bag, she explained: "I had only a shirt on. *** I knew I had my life back. *** I had clothes in the bag. So I grabbed my bag so I could put some clothes on." After defendant drove off, she retrieved pants from the bag and put them on.

¶ 12   C.C. testified that she observed a man on the street and asked to use his phone because she had just been raped. He called 911, and she spoke with the 911 dispatcher, and then she called her mother. Shortly thereafter, the police and her mother arrived. An ambulance transported her to the hospital, where she told them what happened and they utilized a rape kit, swabbing different parts of her body. After she was released from the hospital, she met Detective Watkins who drove her around to identify the places where she had been. After finding the red jacket in the middle of the street, they were able to backtrack from there and locate defendant's house. With the red jacket were also the clothes that defendant had "ripped off of [her]." Later, on July 3, 2013, she viewed a lineup at the police station and picked out defendant as the person who had raped her. Prior to testifying at trial, C.C. viewed a video surveillance tape that depicted her entering defendant's vehicle, and it was admitted into evidence without objection. C.C. also identified several photos, including photos of her showing "[t]he prints around [her] neck from when he choked" her and the scar on her foot from when he pushed her out of the vehicle, and a photo of defendant from the lineup with wrapping around his hand. Prior to her testimony, she listened to the tape of the 911 call, which was also admitted into evidence and published to the jury without objection. C.C. testified that she did not know N.L.

¶ 13   On cross-examination, C.C. explained that she had dropped only the red jacket at the spot where defendant had thrown her out of his vehicle. However, the following morning, found at the same location, were the clothes that he had ripped off of her prior to the rape. On cross, C.C. testified that she was not sure what she grabbed from her bag to put on. She just "threw something on at the time." She put on "bottoms," which could have been a skirt. At the hospital, she handed the clothing that she was wearing to the nurse who inventoried them, and C.C. signed the inventory. The inventory listed a beige skirt, a bra, a shirt, and a black Adidas jacket. C.C. denied telling the nurse and responding police officer Cassandra Hawthorne that, during the first stop, she and defendant exited the vehicle and entered a building to purchase more marijuana. C.C. testified that, after defendant raped C.C. and she bit his fingers, he exited the bed, but he did not leave the room, which was small. He had the knife when they left the house and entered the vehicle. C.C. denied telling the detective at the hospital that she had told defendant when she first met him that she was having her period.

¶ 14   On cross-examination, C.C. testified that, when defendant "was pushing [her] out of his house with the knife," she thought he was going to let her go. She begged him to let her go, and "[h]e said if I let you go, will you not trick on me." She agreed, but he still "put" her in his vehicle. C.C. denied telling the detective that defendant told her to wait by the side door to his house while he walked around to the front door and then opened the side door for her. C.C. thought she heard someone else in defendant's house, but she screamed and no one came.

¶ 15   Susan Kwiatkowski, an emergency room nurse with specialized training in treating sexual assault victims, testified that on June 25, 2013, when she arrived for work at 7 a.m., she learned that there was a sexual assault victim waiting to see her. The notes by the triage nurse indicated

- 4 -

that C.C. had arrived at the hospital by ambulance at 4:30 a.m. When Kwiatkowski first met her, C.C. was curled up under blankets. C.C. told Kwiatkowski that C.C. met a man named Cool; that she told him it was her birthday; that she entered his vehicle; that they drove to a different location, entered a building there, and smoked marijuana together; that they went to a restaurant and then to his house; that at his house he choked and punched her and made her undress; that he removed her tampon; that she bit his thumb; that he entered her vagina without a condom; that he touched her anus; that she vomited at his house; that he drove her to a church and threw her out; and that she met another man who helped her.

¶ 16    Kwiatkowski testified that C.C. told her that the man who helped her also gave her a tissue so she could wipe herself. That action was significant to Kwiatkowski because the tissue could remove evidence. C.C. related that defendant's penis and finger touched her vagina, that his finger touched her anus, and that his lips touched her lips and her neck. C.C. was not sure if defendant ejaculated. Kwiatkowski performed the steps in the sexual assault kit, which included collecting the victim's clothing and swabbing areas that had been touched which included, in this case, C.C.'s neck. The physical exam revealed bleeding in C.C.'s vagina but C.C. indicated that she was on day two or three of her period. Kwiatkowski also observed a scratch on C.C.'s neck that was consistent with being strangled and abrasions on the inside of her foot and on her knee but did not observe any trauma to C.C.'s vagina. Kwiatkowski explained that a sexual assault victim may not experience trauma to the vagina "because mainly the vagina is made to accept a penis." Also, it would "depend on how much force was used."

¶ 17    On cross-examination, Kwiatkowski testified that there was no bruising or swelling on her face consistent with being smacked, and no tears in her vagina or anus. Kwiatkowski "assume[d]" that the blood in C.C.'s vagina was from her period.

¶ 18    Nathan Rhodes, a paramedic with the Chicago Fire Department, testified that, in response to a dispatch at 4 a.m. on June 25, 2013, he and his partner drove their ambulance to meet C.C. When they arrived, she was "[c]rying hysterically," and she told them she had been raped. When asked why he remembered this patient in particular, Rhodes explained "she was 15, on the corner by herself at 4:00 in the morning, and she was raped the day before her 16th birthday." They transported her to the closest hospital emergency room.

¶ 19    Cassandra Hawthorne testified that, on June 25, 2013, she was working as a police officer, in a police uniform, in a marked squad vehicle, without a partner.[1] At 4 a.m., she responded to a 911 call. When Hawthorne arrived, C.C. was already in the back of an ambulance. C.C. appeared "shaken and upset." While in the ambulance, Hawthorne had a brief conversation with C.C. in which C.C. stated that she had been sexually assaulted and identified the street block of the assault. At the hospital, Hawthorne had a longer conversation with C.C. in which C.C. stated that her assailant had a knife and that C.C. bit his finger.

¶ 20    On cross-examination, Hawthorne testified that C.C. told her that C.C. had been "put out" of defendant's vehicle, but C.C. did not tell Hawthorne that C.C. reentered the vehicle and hit her assailant. C.C. also related that they had stopped at a location to buy more marijuana. Hawthorne observed in her report that C.C. appeared intoxicated. On redirect, Hawthorne explained that, when she used the word "intoxicated," she was not referring to alcohol.

¶ 21    Andre Watkins testified that he was currently retired but that, on June 25, 2013, he was working as a Chicago police detective when he met C.C. and her mother in the emergency

---

[1]Hawthorne testified that she was retired at the time of trial.

room at 7 a.m. C.C. was "upset" and "crying." Watkins spoke to C.C. for 20 minutes in an examination room until the doctor entered. Then he conducted a second interview lasting an hour and a half. After C.C. was discharged, he drove her around the area, when they observed clothing lying in the street which C.C. identified as hers. From there, they were able to locate the house where she was raped. They also drove to the restaurant and a couple of other locations and took her home. Subsequently, he was able to retrieve video footage of C.C. entering defendant's vehicle. After returning to the police station and speaking with Detective Minter-Edwards,[2] Watkins had a possible suspect in mind and he created a photo array that included defendant. Later that same day, on June 25, 2013, Watkins showed C.C. the photo array, but she was not able to make an identification from it. After defendant was arrested, C.C. viewed a physical lineup on July 3, 2013, and identified defendant as her assailant.

¶ 22    On cross-examination, Watkins testified that C.C. told him that, when she first met defendant and the other man, she told them that she was "not on any of that stuff," that she had just met them, that it was her birthday week, that she just wanted to have fun, and that she was "on [her] period." While C.C. had told Watkins that she was thrown from the vehicle at the end of the evening, she did not tell Watkins that she reentered the vehicle and hit defendant twice. C.C. told Watkins that, when she and defendant arrived at his house, defendant told her to wait by the side door and defendant walked around to the front door and then opened the side door for her.

¶ 23    The parties stipulated, if called to testify, (1) that Officer Michael Emmett would testify that on June 25, 2013, he took photographs of C.C. and of clothing located in the street, that he received a criminal sexual assault (CSA) kit from Kwiatkoski, which was sent to the Illinois State Police Crime Lab, and that he also received from Kwiatkoski a bag of clothes; (2) that state's attorney investigator Mary Ember would testify that she obtained a buccal swab from defendant, which was then sent to the Illinois State Police for testing; and (3) that Ronald Tomek, a forensic scientist with the Illinois State Police, would testify that he found no semen on the samples in C.C.'s CSA kit but he found saliva on the swab collected from C.C.'s neck.

¶ 24    Ryan Paulsen, a forensic scientist with the Illinois State Police, testified that "[t]he human male DNA profile identified in the neck swab matches the DNA profile" of defendant. There was no cross of Paulsen.

¶ 25    The trial court then gave a limiting instruction stating, in relevant part, that the jurors were
        "about to hear evidence that the defendant has been involved in an offense other than those charged in the indictment. This evidence will be received on the issue of the defendant's propensity, intent, motive, lack of consent, MO, and common scheme and design, and may be considered by you only for those limited purposes."

¶ 26    N.L. testified that she attended school until the tenth grade. On June 22, 2013, she was 16 years old and in the ninth grade. On that day, N.L. attended her best friend's graduation party, leaving the party on foot at 8:30 p.m. She was walking to the bus stop to head home, when a vehicle made a U-turn. A woman approached and said that her brother wanted to talk to her. The brother exited the vehicle, introducing himself as Star, whom N.L. identified in court as defendant. N.L. asked him to take her home, and he said he would. Defendant sat in the driver's seat, N.L. sat in the front passenger seat, and the woman sat in the back. N.L. told defendant where she lived and how to drive there, but he did not follow her directions. Instead, they

---

[2]Detective Minter-Edwards later testified that her first name was Johnnie.

parked in front of a house, and the woman told N.L. to go in. After the three of them went into the house, N.L. sat down on a couch in the living room, and the woman locked the door from the inside with a key. At some point, N.L. learned that the woman, who defendant called Courtney,[3] was not defendant's sister. As far as N.L. knew, they were the only ones in the house. Courtney and defendant walked into a back room and stayed there for 30 or 40 minutes, while N.L. waited for someone to take her home.

¶ 27    N.L. testified that Courtney exited the back room wrapped in a white sheet, and N.L. asked if anyone was going to take her home. Courtney told N.L. to ask defendant, so N.L. went into the back room and asked defendant to take her home. However, defendant said that she "wasn't going anywhere." N.L. repeated her request, saying "please." Defendant rose and choked her, placing both hands on her neck. She had trouble breathing. Defendant told her that she "was going to make money for them and that he was [her] daddy and [Courtney] was [her] mama." He told her to take her clothes off, and she did because he hit her on her face with his fist. N.L. tried to fight back but he raped her, with his penis entering her vagina. He did not wear a condom, and N.L. did not know if he ejaculated. He tried unsuccessfully to place his penis into her anus.

¶ 28    N.L. testified that she started screaming, and defendant called Courtney who entered the bedroom. Defendant told Courtney to slap N.L. to keep her quiet, which Courtney did, on N.L.'s face. Then defendant had anal sex with Courtney and also slapped Courtney on her face. While defendant and Courtney were having sex, N.L. grabbed a bottle from the dresser that defendant had been drinking from and hit defendant on the head. In response, defendant held N.L. down and told Courtney to start slapping N.L. again, which Courtney did, on N.L.'s face.

¶ 29    N.L. testified that, at some point toward morning, defendant fell asleep, and Courtney rose and went to the bathroom. N.L. was trying to find a way to leave, but Courtney observed her and took N.L. to "her kid's room." Courtney kissed N.L.'s breasts and vagina. Against N.L.'s will, Courtney performed oral sex on N.L. and forced N.L. to do the same to Courtney. Afterwards, N.L. climbed down from the bunk bed, and Courtney said she was going to take N.L. home. When Courtney went into the back bedroom, N.L. observed the keys on the counter, opened the door, and left. When N.L. exited the house, she was naked, so she put on a white dress that she had in her bag. After knocking on a neighbor's door and receiving no answer, N.L. ran to a nearby church, entered it, and started crying. A woman in the church asked what was wrong. After N.L. told her, the woman called 911, and N.L. spoke with the 911 operator. The 911 recording was admitted into evidence without objection and played for the jury. In response to the 911 call, the police and an ambulance arrived, and the ambulance transported N.L. to a hospital. After a rape kit was performed and N.L. was discharged from the hospital, Detective Minter-Edwards interviewed her. In court, N.L. identified a photograph of defendant's house. On July 3, 2013, she identified defendant as her assailant from a physical lineup. N.L. did not know C.C.

¶ 30    N.L. admitted that, when she met with Detective Minter-Edwards, she stated at first that, when defendant exited his vehicle, he struck her in the face and put her in his vehicle against her will, and that she woke up naked in his bed in an unfamiliar house with no idea of how she had arrived there. However, Detective Minter-Edwards confronted her about that part of her

---

[3]Since the witnesses called Courtney Richardson simply "Courtney" and did not know her last name, we will also refer to her by her first name.

statement, and N.L. admitted that part was not true. N.L. stated next that she accepted the ride because she was drunk and she passed out in the vehicle, which was also not true. A few weeks prior to trial, N.L. met with the assistant state's attorney (ASA) and provided an entry from N.L.'s journal which stated that N.L. was sober and entered the vehicle willingly. There was no cross-examination.

¶ 31 Detective Lorne Gushiniere, with the Chicago police, testified that on July 3, 2013, he arrested Courtney and defendant, who indicated he was then 28 years old.

¶ 32 After the trial court provided a limiting instruction, L.F., another other-crimes witness, testified regarding defendant's sexual assault of her on June 20, 2013, five days prior to the assault on C.C. At trial, which was in November 2015, L.F. was 29 years old. She had left school during her sophomore year of high school and was currently working in the "[f]ood industry" and was on probation for burglary. At 6 a.m. on June 20, 2013, L.F. was working as a kitchen manager at a college, and her shift began. At 8 a.m., she had a dispute with her employer and quit. L.F. began walking home, which was three miles away, because she did not have another option. L.F. testified: "I was angry. I didn't feel good at all. I had to walk home. I hadn't slept. I was crying. It was hot." On her way home, she entered a restaurant that was near a gas station, and defendant approached, introducing himself as Star. After she told him what had happened, he offered her a ride home. Defendant was with a woman named Courtney whom he introduced as his sister. L.F. explained that she accepted the ride because "[i]t made me feel like it was okay to be—to get in the car since—I mean there was another girl there."

¶ 33 L.F. testified that defendant drove, Courtney sat in the front passenger seat, and L.F. sat in the backseat behind the driver. Both defendant and Courtney were smoking marijuana and drinking alcohol, but L.F. did not. They drove to two small grocery stores and defendant's mother's house where Courtney exited the vehicle. L.F. then entered the front passenger seat, and defendant drove to his house and parked. When they parked, L.F. asked him to take her home, and he said he "needed to grab something" and then they would go. After they entered his house, defendant locked the door from the inside with a key. No one else was in the house. When L.F. asked him "to get what he was going to get so" they could "get going," defendant replied that she should come to his room because the air conditioning was there and they could "cool off for a bit" before heading out. After they entered the room, he turned on the television, she sat on the bed, and he told her to take her clothes off. She started "[p]anicking." When she did not take her clothes off, he raised his voice and "ripped" off her clothes. Then he took off his clothes and raped her, placing his penis inside her vagina without a condom three separate times. During the rape, he told her that he had "picked" her and to call him "Papi." L.F. speaks Spanish, and she testified that "Papi" means "daddy" in Spanish. While raping her, he "choked" her, "slapped" her face, and "spat" on her. She had trouble breathing. Defendant also tried to place his penis inside her anus, but he did not because she grabbed a liquor bottle off his dresser and attempted to hit him in the head with it. She did not succeed in hitting him on the head.

¶ 34 L.F. testified that, after she tried to hit him with the bottle, defendant rose and told her that she could go, that she did not have to do that, and that she could go whenever she wanted. In response, she gathered her things and started to leave, but he would not let her go. He kept bringing her back to the room. When she was able to reach the front door, she realized it was locked and she could not exit. As she was trying to exit the front door, defendant began to hit

her with his fists on her head and back. As they were wrestling, he was able to move her toward his room at the back of the house, but they did not make it to his room; so he opened the basement door and pushed her down the stairs. L.F. fell down eight stairs. When he opened the basement door, some "really big dogs" came up the stairs, and defendant told the dogs "to get" her, but they did not. L.F. reached the landing of the stairs, opened the back door, and ran out, "stark naked," to a neighbor's house. After the neighbor called the police, L.F. sat in front of the neighbor's house, waiting for the police, and observed defendant run out of his house and drive away.

¶ 35    L.F. testified that the police offered to call an ambulance, but she did not agree to that because she just wanted to go home. A few days later, L.F. was interviewed by Detective Minter-Edwards and her partner Detective Ghoulston.[4] L.F. identified defendant as her assailant from a photo array and identified a photo of his house. On July 3, 2013, she identified defendant from a physical lineup. L.F. did not know either C.C. or N.L.

¶ 36    On cross-examination, L.F. denied that defendant fell asleep and woke to find L.F. going through his pants pockets and that is when she hit him with a liquor bottle. When L.F. was at the neighbor's house, L.F. asked for a shirt, and the neighbor gave her one. L.F. testified that she told the police officers about the dogs, and she denied that a police officer transported her to a hospital before she refused to be examined. L.F. testified that she told the police that defendant spat on her and that, when defendant parked in front of his house, she asked him to take her home. The first officer who arrived at the neighbor's house went with L.F. back to defendant's house to retrieve her belongings. On redirect, L.F. explained that she wanted her belongings because there were bills and pay stubs, with her address and phone number, and she did not want defendant to be able to find her again.

¶ 37    After the State rested and the trial court denied defendant's motion for a directed verdict, the defense case proceeded first by stipulation. The parties stipulated that if Detective Minter-Edwards was called to testify, she would testify that she interviewed L.F. about the incident on June 20, 2013, and made a report about it and that her report did not state (1) that L.F. asked defendant to take her home when they were parked in front of his house, (2) that defendant spat on L.F., or (3) that defendant ordered his dogs to bite L.F.

¶ 38    Defendant took the stand in his own defense and testified that he had "a prior unlawful use of a weapon by felon conviction from 2006," which he had pled guilty to. Courtney was the mother of his child and lived with defendant. On June 20, 2013, between 8 a.m. and 9 a.m., defendant met L.F. at a restaurant when he was ordering food and Courtney was at a gas station across the street. Defendant introduced himself to L.F. and asked how she was doing. L.F. replied that she had just been fired and was walking home. Defendant offered her a ride. In exchange for the ride, he "asked her if she would kick it with [him] for a while and when [they] were done, then [he] would drop her off at home." By "kick it," he meant smoking marijuana and consuming a few drinks. It did not concern him that Courtney was across the street because they had an open sexual relationship, which included three-way sex on occasion.

¶ 39    Defendant testified that he and L.F. crossed the street to his vehicle where he introduced Courtney as his sister because he did not want L.F. "to feel uncomfortable." Defendant sat in the driver's seat, Courtney sat in the front passenger seat, and L.F. sat in the backseat. They drove to a liquor store, which he and Courtney entered to buy a pint of tequila because that is

---

[4]Detective Minter-Edwards later testified that her partner's first name was Jennifer.

what L.F. said she drank. L.F. waited for them in the vehicle. The three of them then drove around "aimlessly," listening to music, drinking tequila, and smoking marijuana. Defendant then drove to his mother's house where he parked, and defendant and Courtney exited the vehicle. Defendant told Courtney that he was going to leave her at his mother's house and go home with L.F., who moved from the backseat to the front passenger seat. Defendant told L.F. that he intended to take her to his house and have sex with her, and she agreed. It was not in exchange for anything.

¶ 40    Defendant testified that, after he drove to his house, he and L.F. exited the vehicle and entered his house. He locked the door with a key, which he placed on the kitchen counter. Defendant testified that he did not threaten, choke, or hit her and did not spit on her. They went to his room, which is obviously a bedroom because there is a large bed in it, and they made "small talk." L.F. did not say she wanted to leave. Initially, she did not want to remove her clothes because she said she was sweaty, so defendant offered her a towel to freshen up. Then she removed her clothes, and defendant removed his clothes, and they had both vaginal and oral sex. Each performed oral sex on the other. Defendant ejaculated into her vagina. Afterwards, they watched television and defendant smoked a cigarette. Then they had vaginal sex two more times. L.F. did not say no or struggle or say that she wanted defendant to stop. After the third time, defendant fell asleep and woke to find L.F. going through his pants pockets. L.F. grabbed a tequila bottle and hit defendant in the head with it, so that he was bleeding. She swung the bottle a second time, hitting defendant in his hand which bled. When defendant rose from the bed, she ran toward the front door, while yelling "I'm sorry, I'm sorry," but the front door was locked. Defendant asked: "why the h*** did you just hit me with a bottle?" After putting on his pants, he retrieved her clothes, threw them toward her, and told her to leave his house. After defendant opened the front door, she took off running without even grabbing her clothes. After L.F. left, he drove to the police station to make a police report. When he returned home, L.F.'s clothes were gone, and he wondered where they went.

¶ 41    Defendant testified that he met N.L. on June 23, 2013, at 9 p.m. while he was out driving with Courtney. They observed N.L. walking back and forth, and they thought she was cute and decided to approach her to see if she would have a "three-some" with them. Courtney rolled down her window and said hi, and N.L. approached. Defendant asked how old she was, but an objection to N.L.'s answer was sustained. The three of them agreed that defendant would give N.L. $100 if N.L. came home with them and had a three-some with defendant and Courtney. In the vehicle, the three of them drank vodka and smoked marijuana. After driving to defendant's home, the three entered the house, and Courtney locked the door and placed the key on the kitchen counter. They sat down in the front room, talking and smoking. Then defendant and N.L. went to his bedroom in the back of the house and had vaginal sex. Defendant did not hit or choke her, and she did not say no or struggle. After defendant and N.L. had been in his bedroom for 15 minutes, Courtney joined them, and Courtney and N.L. had sex. Then defendant ejaculated in Courtney's vagina and fell asleep. When he woke up, N.L. was gone and he did not know where N.L. went.

¶ 42    Defendant testified that he was with his friend, Cody Freeman, when he met C.C. at 3 a.m. on June 25, 2013. Defendant and Freeman were driving, while C.C. was walking. They stopped their vehicle with the intent of approaching C.C. to offer her money for sex. Observing that both her arms were completely covered in tattoos, defendant assumed she was an adult. Defendant asked her age and learned it was her birthday. After Freeman, who was driving,

stopped their vehicle, C.C. approached. Defendant offered her $50 for sex, and she agreed. After C.C. entered the backseat, the three of them drove around, drinking vodka and smoking marijuana, before heading to defendant's mother's house. When they reached his mother's house, all three of them exited the vehicle and entered the house so that he and C.C. could have sex. But, as they entered, his mother woke up, and so they left, this time heading to a restaurant.

¶ 43    Defendant testified that C.C. waited in the vehicle while he and his friend entered the restaurant, and defendant purchased sandwiches for Freeman and C.C. After dropping Freeman off at Freeman's house, defendant drove to his own house, parking five or six houses away. Defendant parked there because there was no spot in front. After he and C.C. walked to his house, he told her to wait by the side door while he entered by the front door and then came around to open the side door for her. After she entered, they walked into his bedroom. C.C. went to the bathroom, and after she returned, they started kissing and having vaginal sex. Defendant did not hit or choke her, and she did not struggle. They both took off C.C.'s clothes, and defendant removed his own clothes. Defendant did not remove a tampon and place it on a windowsill. However, C.C. had told him when she first entered the vehicle that she had her period. Defendant did not ejaculate because she was bleeding heavily, so he asked for oral sex. C.C. agreed but told defendant he had to wash first, so he went to the bathroom and took a shower that lasted 15 minutes. When he reentered the bedroom, C.C. was fully dressed, in a skirt and a black jacket. At no time did he pull a knife. C.C. did not vomit and did not bite him. The two of them walked to his vehicle together so he could obtain change at a gas station in order to give her $50. During the ride, he told her he was going to leave her at the gas station and she could take the subway. When he pulled over, she hit him. He did not hit her back, but he did push her out of the vehicle. When she exited the vehicle, she was dressed in the same skirt and jacket as when she left his house and she was carrying her bag.

¶ 44    On cross-examination, defendant testified that he was 28 years old in 2013. He denied ever using the name Cool and denied telling Detective Minter-Edwards on July 3, 2013, that he used the nickname Cool. In 2013, he had two pit-bull mix dogs. When he was arrested on July 3, 2013, his hand was injured and wrapped in an Ace bandage. When defendant first observed C.C., she was on the other side of the street, and from there he did not observe her tattoos. Their conversation before she entered the vehicle was less than 10 seconds. In that brief conversation, he learned that it was her birthday and she wanted to party, and he offered her money. Defendant testified that the surveillance video that showed their initial encounter was not complete, in that it did not show him exiting the vehicle and talking to C.C. They agreed on $50 for a "nut," which is slang for an orgasm. Defendant testified that he had frequented prostitutes about 10 times and that one always agreed on the price first but not necessarily the specific act. As they were driving around, he gave her alcohol and marijuana for free. Then he brought C.C., a prostitute, to his mother's house at 3 a.m. However, when his mother woke up and asked "who was the girl in her house," he told his mother that C.C. was his "friend."

¶ 45    Defendant testified that he had been drinking and smoking marijuana so that, when he dropped Freeman off at Freeman's house and took the wheel, he was intoxicated. When he and C.C. arrived at his house, he parked five or six houses away, "[j]ust like [C.C.] said." Defendant denied entering the side door and testified that he did not recall why he asked her to wait by the side door while he went through the front door and let her in through the side door. The front door is locked with a key and a dead bolt. After entering the house by the front door, he locked the front door and removed the key, just as he had done with L.F. With N.L., defendant

- 11 -

"assum[ed]" that Courtney had locked the door. After he and C.C. entered his house, they went to his bedroom and were talking. He did not ask her if she had ever been "f***" in the "a***," and they had no conversation about anal sex. C.C. had told him, when she first entered the vehicle, that she had her period, so they had agreed on oral sex for $50. However, after arriving at his house, she went into the bathroom and emerged, and they had vaginal sex because she said that she was "spot bleeding and almost off her period." During sex, she started to bleed heavily, and he was not wearing a condom. Defendant did not recall telling Detective Minter-Edwards that he did not like wearing condoms. When he realized that she was bleeding heavily, he could not ejaculate and asked her to finish with oral sex. She agreed, without asking for more money for two sex acts. Defendant never asked her to call him "daddy." After he took a shower, "she said she had been with me too long, and she was ready to leave" and she wanted her money. Defendant dressed so that he could drive her home. When they were in his vehicle, he drove a short distance to a church and put her out. She reached back in the vehicle, grabbed her bag of clothes, and punched defendant more than twice.

¶ 46    Defendant testified that while he told L.F. that Courtney was his sister, he did not say that to N.L. Defendant offered N.L. $100 for a threesome and denied telling Detective Minter-Edwards that he offered N.L. $50. Defendant denied telling N.L. that he was her daddy, denied slapping Courtney, and denied that N.L. hit him with a liquor bottle. It was his opinion with respect to N.L. that nothing bad or unusual happened and that everyone enjoyed themselves and had a good time.

¶ 47    Defendant testified that, when he offered L.F. a ride home, he expected something in exchange, which was to party with him. They drank, smoked, and drove around, as he did with C.C. and N.L. As he had with C.C., he stopped at his mother's house. With C.C., they had entered the house. With L.F., he dropped Courtney off. He dropped Courtney off because he had not approached her "with the three-some idea." His plan with L.F. was that "[s]he was going to spend time with [him], and [he] was going to drive her home after [they] kicked it." It was hot, and he asked L.F. back to his house, which has central air. After they entered, he locked the front-door dead bolt and placed the key on the kitchen counter as he "always" does. After L.F. hit him with a bottle, she ran toward the front door, but she could not exit because the door was locked. Defendant denied telling the detectives on July 3, 2013, when he was arrested that he liked to pick up unattractive women because they want attention.

¶ 48    On redirect, defendant testified that the injury that he had on his hand when he was arrested was from when L.F. hit him with a bottle.

¶ 49    The defense rested, and in rebuttal, the State called Detective Johnnie Minter-Edwards, who testified that she had been employed with the Chicago police for 23 years, first as a patrol officer and then as a detective. In her work, she has encountered prostitutes both as victims and as offenders. Based on her experience, she had learned "the going rate" for different sex acts. The average price for oral sex was $10 to $20, while vaginal and anal sex cost more. On July 3, 2013, at 8 p.m., she and her partner, Detective Ghoulston, interviewed defendant, and he stated that he paid N.L. $50 to "kick it," and she asked why N.L. was stating that he raped her if he had not. Defendant replied that N.L. might be upset because he struck Courtney during sex. Defendant stated that he had anal sex with L.F., that he did not like to wear a condom, and that he picks up unattractive women because they want attention.

¶ 50    The State offered a certified copy of defendant's prior conviction, which was admitted without objection, and rested its rebuttal case. After oral arguments and jury instructions, the

jury found defendant guilty on all counts, and he was sentenced to a total of 70 years. We discuss his sentencing in more detail below when analyzing the claims that he raises with respect to it.

¶ 51                                          ANALYSIS

¶ 52                                         I. Grand Jury

¶ 53     Defendant's first claim is that his indictment for aggravated kidnapping is defective because Detective Watkins's grand jury testimony in support of that offense was false or misleading. Defendant argues that the trial court erred in denying his pretrial motion to vacate the aggravated kidnapping counts on this ground. Defendant's sole basis for claiming that Detective Watkins's grand jury testimony was false is that his testimony allegedly contradicted his subsequent police report.

¶ 54     Our supreme court has found that the permissible challenges to a grand jury proceeding are limited. *People v. Wright*, 2017 IL 119561, ¶ 61. Generally, if the grand jury was legally constituted, a criminal defendant may not challenge the validity of the indictment that it returned. *Wright*, 2017 IL 119561, ¶ 61. Even when the grand jury is legally constituted, a criminal defendant may still challenge an indictment obtained "through prosecutorial misconduct." *Wright*, 2017 IL 119561, ¶ 61. To successfully challenge an indictment on this ground, the defendant must show that the misconduct rose "to the level of a deprivation of due process or a miscarriage of justice." *Wright*, 2017 IL 119561, ¶ 61. A due process violation occurs when the State (1) "deliberately or intentionally misleads the grand jury," (2) "uses known perjured or false testimony," or (3) "presents other deceptive or inaccurate evidence." *Wright*, 2017 IL 119561, ¶ 62. In the case at bar, defendant claims that the State presented testimony that was (1) false or, at the least, (2) misleading.

¶ 55     "To warrant dismissal of the indictment, a defendant must show" that the State's misconduct "prevented the grand jury from returning a meaningful indictment." *Wright*, 2017 IL 119561, ¶ 62; *People v. Oliver*, 368 Ill. App. 3d 690, 696-97 (2006) (to warrant dismissal, the prejudice must be actual and substantial). "[A] due process violation consisting of prosecutorial misconduct before a grand jury is actually and substantially prejudicial only if without it the grand jury would not have indicted the defendant." *Oliver*, 368 Ill. App. 3d at 696-97.

¶ 56     To illustrate the type of misconduct that justifies a dismissal of an indictment, our supreme court discussed the appellate court case of *Oliver*, 368 Ill. App. 3d 690. *Wright*, 2017 IL 119561, ¶ 63 (discussing the facts of *Oliver*). In *Oliver*, a police officer falsely testified before a grand jury that he had personally witnessed the defendant's hand-to-hand narcotics transactions when, in fact, he had not observed the transactions and was relying on another police officer's report. *Wright*, 2017 IL 119561, ¶ 63 (citing *Oliver*, 368 Ill. App. 3d at 691, 694). The appellate court in *Oliver* found that the grand jury would not have found probable cause to indict without the officer's misleading testimony. *Oliver*, 368 Ill. App. 3d at 698-99. As a result, the appellate court's dismissal of the indictment was appropriate because the defendant had "shown that he suffered actual and substantial prejudice due to the officer's testimony." *Wright*, 2017 IL 119561, ¶ 63 (citing *Oliver*, 368 Ill. App. 3d at 699).

¶ 57     To support his claim, defendant relies solely on the grand jury transcript and the officer's written report. When our review is limited to documentary materials, as it is here, then our review is generally *de novo*. *People v. Morrow*, 2019 IL App (1st) 161208, ¶ 60; see also

- 13 -

*People v. Legore*, 2013 IL App (2d) 111038, ¶ 23 ("[w]here the facts about what occurred at a grand jury proceeding are undisputed, as in this case, we review *de novo*" the question of whether the defendant was denied due process). *De novo* consideration means that we perform the same analysis that a trial judge would perform. *Morrow*, 2019 IL App (1st) 161208, ¶ 61.

¶ 58    Before the grand jury on July 23, 2013, Detective Watkins testified "[y]es," when asked if his investigation revealed that defendant and C.C. went inside defendant's residence; that, while in a bedroom in the residence, defendant, by the use of force, committed acts of sexual penetration on C.C.; that C.C. struggled to become free from defendant; that defendant placed a knife to her side; that defendant "then took [C.C.] by knife point to a vehicle and [defendant] drove [C.C.] away"; and that defendant eventually stopped the vehicle and "kicked [C.C.] out of it" and drove away.

¶ 59    Three months later, on October 26, 2013, Detective Watkins submitted a nine-page report entitled "A Field Investigation Cleared Closed (Arrest and Prosecution) Report," in which he requested permission to classify the case "as Clear Closed Arrest and Prosecution." In the report, the detective observed that he had conducted an interview with the victim, "which revealed the following" and "was memorialized in essence but not verbatim." The report stated that, after describing the sexual assault, the victim related that she began screaming and throwing up and defendant pulled out a knife and told her, " 'To shut up, the police are coming.' " C.C. related that defendant threatened her and forced her out of his house nude, but she was able to grab defendant's red hoodie and wrap it around her because she had nothing else on. C.C. related that she "got into [defendant's] vehicle hoping he would drop her off," and he drove for approximately 15 seconds before stopping the vehicle and telling her, " 'B***, get the f*** out.' " C.C. attempted to grab a few of her things before defendant shoved her out of his vehicle and onto the ground, where she sustained abrasions and cuts to her legs and arms.

¶ 60    On appeal, defendant argues that the report states that the victim entered defendant's vehicle *because* she was hoping that he would drop her off and that this sentence contradicts the detective's grand jury testimony that defendant "took [C.C.] by knife point to a vehicle." The trial court denied his motion, calling it mere "semantics."

¶ 61    First, defendant is reading the word "because" into a sentence that does not contain this word. The fact that the victim was forced to a vehicle by knife point does not negate the possibility that she also entered the vehicle "hoping he would drop her off," as he did. Thus, from a bare comparison of the two sentences at issue, there is no contradiction.

¶ 62    Second, the police report states that it is a summary—that the detective's interview of the victim "was memorialized in essence but not verbatim." Both the grand jury testimony and the police report indicate that defendant threatened the victim with a knife and forced her out of his house and that they entered his vehicle. The fact that the report does not additionally state that defendant continued to threaten the victim with a knife as they entered the vehicle does not mean that the report contradicts the testimony.

¶ 63    Third, defendant argues in his brief to this court: "The prosecutor fed Watkins his testimony—all he ever said was 'yes'—and she had to have read his report." However, the report was submitted a full three months *after* the grand jury testimony occurred.

¶ 64    Fourth, the detective based his grand jury testimony upon his investigation, and that investigation included an interview with the victim in which she described the events. The accuracy of his grand jury testimony was later substantiated by the description that she provided at trial. At trial, the victim testified that, while defendant "still" had the knife "out,"

- 14 -

"[h]e take me [*sic*] and put me in his car." She testified that she did not "want to go in his car."[5] Similarly, before the grand jury, the detective testified that defendant "took [the victim] by knife point to a vehicle."

¶ 65　　With respect to subsequent testimony, the facts here are almost the opposite of the factual situation in *Oliver* that required reversal. In *Oliver*, testimony at subsequent hearings revealed that the officer's prior grand jury testimony was false, leading the State to admit that the officer had not witnessed the transactions that he had claimed before the grand jury to have observed. *Oliver*, 368 Ill. App. 3d at 694. In contrast to *Oliver*, in the case at bar, the victim's trial testimony substantiated the accuracy of the detective's grand jury testimony.

¶ 66　　For the foregoing reasons, we can find neither a due process violation nor prejudice.

¶ 67　　　　　　　　　　　　　　　　II. Opening Statement

¶ 68　　Defendant claims that the State undermined the presumption of innocence in several ways, including by referring to him as a rapist in its opening statement.

¶ 69　　In response, the State argues, first, that defendant forfeited for review the claimed errors in its opening statement by failing to object at trial.

¶ 70　　To preserve a purported error for consideration by a reviewing court, a defendant must both (1) object to the error at trial and (2) raise the error in a posttrial motion. *People v. Sebby*, 2017 IL 119445, ¶ 48. "Failure to do either results in forfeiture." *Sebby*, 2017 IL 119445, ¶ 48. Since defendant did not object during the State's opening statement, the claimed errors in the State's opening statement are forfeited for our review.

¶ 71　　However, the plain error doctrine permits a reviewing court to consider an unpreserved error (1) when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) when a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Sebby*, 2017 IL 119445, ¶ 48; *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Defendant asks us to consider the claimed error under both prongs.

¶ 72　　In a plain error analysis, it is the defendant who bears the burden of persuasion. *Sebby*, 2017 IL 119445, ¶ 51. Whether the defendant argues first- or second-prong error, the first step under either prong of the plain error doctrine is to determine whether there was a clear or obvious error at trial. *Sebby*, 2017 IL 119445, ¶ 49; *Piatkowski*, 225 Ill. 2d at 565. Thus, we consider first not simply whether an error occurred but whether a clear and obvious error occurred. In addition, we may affirm on any basis found in the record. *People v. Begay*, 2018 IL App (1st) 150446, ¶ 35; *People v. Daniel*, 2013 IL App (1st) 111876, ¶ 37 ("we may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct").

¶ 73　　While the State has wide latitude in both its opening statements and closing arguments and may comment on the evidence, it is still improper for the State to make comments that have no other purpose than to arouse the prejudices and passions of the jury. *People v. Jones*, 2016

---

[5]In his reply brief to this court, defendant acknowledged that the victim's trial testimony "did describe a kidnapping."

IL App (1st) 141008, ¶ 21; *People v. Herndon*, 2015 IL App (1st) 123375, ¶ 36 ("[i]t is improper for a prosecutor to make comments irrelevant to the question of guilt or innocence and that only serve to inflame the jury's passions"). In the past, this court has criticized the use of derogatory epithets to describe a defendant, such as that he is a " 'cold-blooded criminal[ ]' " (*Jones*, 2016 IL App (1st) 141008, ¶ 6), an " 'animal' " (*People v. Johnson*, 119 Ill. 2d 119, 139-40 (1987)), or a " 'crack-head' " (*People v. Deloney*, 359 Ill. App. 3d 458, 469 (2005)). We have criticized the use of such epithets, even when they are arguably based on the evidence. *Johnson*, 119 Ill. 2d at 139.

¶ 74    Even if the remarks were inappropriate, reversal is required only if they engendered such substantial prejudice against the defendant that it is impossible to tell whether the verdict of guilt resulted from them. *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007); *Johnson*, 119 Ill. 2d at 139-40; *Jones*, 2016 IL App (1st) 141008, ¶ 23. If the reviewing court cannot say whether the prosecutor's improper remarks contributed to the defendant's conviction, then it must grant a new trial. *Wheeler*, 226 Ill. 2d at 123; *Jones*, 2016 IL App (1st) 141008, ¶ 23.

¶ 75    Defendant forthrightly acknowledges that this court has applied, in different cases, both a *de novo* standard and an abuse of discretion standard when reviewing a prosecutor's opening statement. Compare, *e.g.*, *Deloney*, 359 Ill. App. 3d at 470 ("generally left to the circuit court's discretion"), with *Jones*, 2016 IL App (1st) 141008, ¶ 23 ("*de novo*"). Interestingly, in support, both *Deloney* and *Jones* cite cases[6] that reviewed closing arguments rather than opening statements and, thus, reflect the long-standing confusion that this court has often noted concerning the appropriate standard of review to be applied to closing arguments. See *People v. Boston*, 2018 IL App (1st) 140369, ¶ 82; *People v. Johnson*, 2015 IL App (1st) 123249, ¶ 39 ("[t]his court has noted confusion regarding the appropriate standard of review regarding alleged errors occurring during closing arguments"); *People v. Johnson*, 385 Ill. App. 3d 585, 603 (2008) ("Since *Wheeler*, appellate courts have been divided regarding the appropriate standard of review."). In the case at bar, we need not resolve this dispute because the outcome would be the same under either standard of review for the reasons that we explain below.

¶ 76    In the case at bar, immediately prior to the State's opening, the trial court instructed the jury: "An opening statement is not evidence and should not be considered by you as evidence. It is a statement by a lawyer as to what he or she expects the evidence to show. With that, the State may make an opening statement."

¶ 77    The State began its opening statement by arguing: "Good afternoon. You are sitting in the company of a rapist. This is who he is and what he does. The defendant prays [*sic*] and targets young teenage girls, girls that are impressed by his looks, his car, and his smooth talking." The State ended by stating: "what you will find at the end of this trial is that there is only one logical conclusion to reach, and that is it is impossible for these girls, these victims who do not know each other to tell you the same thing unless it's the truth. And that truth is that the defendant is a rapist. That is who he is and what he does."

¶ 78    The defense began its opening statement by arguing: "Ladies and gentlemen, this is not a rape, and [defendant] is not a rapist." The defense ended its opening by stating:

---

[6]*Jones*, 2016 IL App (1st) 141008, ¶ 23, cites *Wheeler*, 226 Ill. 2d at 121 (discussing "II. Propriety of the Prosecutor's Closing Argument"), while *Deloney*, 359 Ill. App. 3d at 470, cites *People v. Ellis*, 315 Ill. App. 3d 1108, 1121 (2000) ("closing argument [is] left largely to the circuit court's discretion"), and *People v. Kirchner*, 194 Ill. 2d 502, 549 (2000) (closing argument).

"At the end of the day, at the close of the evidence, th[is] is a tale of a date, and it's identical when it's told by [the victim] and it's told by [defendant] until the very end. And only [defendant's] testimony is consistent with the evidence. [The victim's] is not.

This was a consensual sexual transaction. This was not a rape. And [defendant] is not a rapist. Thank you."

Since the defense had the last word in opening statements, the last statement heard by the jury before the trial began was the defense's assertion that this was consensual sex and not a rape.

¶ 79 As the defense's opening remarks make clear, defense counsel made the strategic decision not to object to the prosecutor's remarks and, instead, to use those remarks to frame the defense's own opening statement. Defense counsel chose to frame the question for the jury as whether defendant was, or was not, a rapist—beginning and ending the defense's own opening statement that way. We cannot say this was an unreasonable strategic choice, given that defendant conceded the sexual encounter and disputed only the issue of consent. Using the same layperson's terms that the State had, defense counsel reduced the issue to was there consent or rape. In light of the defense's strategic choice, we cannot find either a clear or obvious error or substantial prejudice from the prosecutor's remarks.

¶ 80                                    III. Impeachment Evidence

¶ 81 Prior to trial, the State filed a motion seeking to use defendant's prior felony conviction as impeachment evidence if defendant testified, and the trial court granted the motion.

¶ 82 After the motion was granted, defense counsel asked the trial court to direct the State to refer to the offense, which was unlawful use of a weapon by a felon (UUWF), "as either an unlawful use of a weapon or *** an aggravated unlawful use of a weapon and redact from that conviction the word [']felon['] because that[,] through the back door[,] lets in another felony conviction."

¶ 83 The trial court ruled: "No, the offense is unlawful use of [a] weapon by felon." On appeal, defendant challenges this ruling.

¶ 84 First, defendant argues that, even though he did not raise the issue again in a posttrial motion, his pretrial motion alone was sufficient to avoid forfeiture. This court previously considered this precise claim and rejected it in *People v. Williams*, 2015 IL App (1st) 130097, ¶ 36. In *Williams*, as in our case, the State sought to use as impeachment evidence a defendant's prior UUWF conviction. *Williams*, 2015 IL App (1st) 130097, ¶ 46. In *Williams*, the defendant "request[ed] that" his prior "UUWF felony not be named" and that the State be limited to impeaching him with merely the fact of his prior conviction. *Williams*, 2015 IL App (1st) 130097, ¶ 51. In *Williams*, the defendant argued, as does defendant here, that his pretrial motion alone preserved the claim. *Williams*, 2015 IL App (1st) 130097, ¶ 36. As we did in *Williams*, we reject this argument as unpersuasive for the reasons explained below.

¶ 85 Regarding forfeiture, defendant argues that the improper admission of evidence of another felony violated his due process right to a fair trial and that the constitutional-issue exception to the forfeiture rule permits this court to review this otherwise forfeited constitutional claim. See *People v. Cregan*, 2014 IL 113600, ¶ 16. Under this exception, a claim is "not subject to forfeiture for failing to file a posttrial motion" if the claim concerns "constitutional issues that were properly raised at trial and [that] may be raised later in a postconviction petition." *Cregan*, 2014 IL 113600, ¶ 16. Our supreme court recognized this exception "primarily in the interest

of judicial economy." *Cregan*, 2014 IL 113600, ¶ 18. "If a defendant were precluded from raising a constitutional issue previously raised at trial on direct appeal, merely because he failed to raise it in a posttrial motion, the defendant could simply allege the issue in a later postconviction petition." *Cregan*, 2014 IL 113600, ¶ 18. "Accordingly," our highest court found that "the interests in judicial economy favor addressing the issue on direct appeal rather than requiring defendant to raise it in a separate postconviction petition." *Cregan*, 2014 IL 113600, ¶ 18.[7]

¶ 86 However, as this court has explained, this exception has its limits. See *People v. Davis*, 2019 IL App (1st) 160408, ¶ 53. "[N]ot every error that could potentially deprive a defendant" of his or her constitutional right to a fair trial establishes the kind of constitutional error required for the exception. *Davis*, 2019 IL App (1st) 160408, ¶ 54. Simply put, mere "evidentiary errors" do not trigger the application of an exception created specifically for constitutional errors. *Davis*, 2019 IL App (1st) 160408, ¶ 54. "[T]he question of the admissibility of evidence" is not one of "constitutional magnitude." *Davis*, 2019 IL App (1st) 160408, ¶ 54. Specifically, this court found that the admission of evidence of other crimes was not an issue that qualified for the forfeiture exception, and we see no reason to depart from this precedent. *Davis*, 2019 IL App (1st) 160408, ¶¶ 54-56. Thus, this issue is forfeited for our review, and the plain error rule, which we already described in the prior section, applies to this claim as well.

¶ 87 Turning to the question of whether a clear or obvious error occurred, defendant acknowledges that the appellate court has already considered this issue in two prior opinions and found against his claim, but he argues that our precedent was wrongly decided. See *Williams*, 2015 IL App (1st) 130097, ¶ 51; *People v. Catchings*, 2018 IL App (3d) 160186, ¶ 51. First, whether or not our precedent was wrongly decided, the error is not a good candidate for "clear or obvious" error when the applicable precedent goes the other way. See *Sebby*, 2017 IL 119445, ¶ 49.

¶ 88 Second, we do not agree that our precedent was wrongly decided. In *Williams*, this court could "not find that allowing the State to enter the name of the prior conviction," which was UUWF, "was error, as it accurately informed the jury of the nature of the prior crime." *Williams*, 2015 IL App (1st) 130097, ¶ 51. It is not merely the fact of a prior conviction that aids the jury in assessing a witness's credibility but "the nature" of that prior conviction. *Williams*, 2015 IL App (1st) 130097, ¶ 51. In *Catchings*, the appellate court found that "the nature" of the UUWF conviction "required reference to [the] defendant's status as a felon." *Catchings*, 2018 IL App (3d) 160186, ¶ 51. However, "[t]his reference is not tantamount to the introduction of a second conviction, as it does not describe the name or nature of the predicate felony." *Catchings*, 2018 IL App (3d) 160186, ¶ 51. Without the name or nature, "the prejudicial effect of the State's reference to defendant's prior felony status was limited." *Catchings*, 2018 IL App (3d) 160186, ¶ 51. Thus, the *Catchings* court found that the State's

---

[7]In addition to *Cregan*, defendant also cites *People v. McGee*, 398 Ill. App. 3d 789, 795 (2010). However, in *McGee*, we observed that the State argued that defendant had forfeited the issue, but that we could still review the issue, "despite" forfeiture, "under the plain error rule." *McGee*, 398 Ill. App. 3d at 795. The *McGee* court then stated that it would begin its analysis by considering "whether an error occurred" (*McGee*, 398 Ill. App. 3d at 795), which is the first step in any plain error analysis (*Sebby*, 2017 IL 119445, ¶ 49). Thus, *McGee* does not further defendant's argument.

reference to defendant's status as a felon was "simply a necessary part of the felony that the State used to impeach defendant's credibility." *Catchings*, 2018 IL App (3d) 160186, ¶ 51.

¶ 89    In the case at bar, we are unclear how adding the word "aggravated" to the prior conviction, as defendant's counsel suggested at trial, would have aided the defense. It would have made the jury believe he was convicted of a more serious crime than he actually was. Also, leaving out the words "by a felon" would have left the jury wondering what made the use unlawful, in light of the fact that the right to bear arms is a well-known constitutionally protected right. Defendant cites in support *People v. Casillas*, 195 Ill. 2d 461, 486 (2000), in which the supreme court observed that the trial court had minimized the prejudicial impact of the State's use of the defendant's UUWF conviction as impeachment evidence by requiring the State to refer to the offense without the "felon" language. First, rather than adopting this approach for all cases, the supreme court merely made this observation in the context of rebutting defendant's claim that the trial court had failed to consider the factors "for and against admission of the evidence." *Casillas*, 195 Ill. 2d at 486. Second, the *Casillas* case was decided years before the United States Supreme Court began strengthening the constitutionally protected right to bear arms with the landmark case of *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). *People v. Aguilar*, 2013 IL 112116, ¶ 16 (in *Heller*, the United States Supreme Court undertook "its first-ever" comprehensive examination of the second amendment and concluded that it guaranteed the individual the right to possess and carry weapons in case of confrontation). Thus, we do not find defendant's cite of *Casillas* dispositive.

¶ 90    For the foregoing reasons, we cannot find a clear or obvious error in the trial court's decision not to redact the words "by a felon" from the State's impeachment evidence.

¶ 91                                    IV. Other-Crimes Evidence

¶ 92    L.F., who was not the victim in this case, testified that, five days prior to the assault at issue in this case, defendant had sexually assaulted her. On appeal, defendant concedes that her testimony about the sexual assault was permissible.

¶ 93    However, after the sexual assault, L.F. testified that, when she tried to escape, defendant threw her down the stairs and ordered his dogs to attack her, although they did not. It is this testimony that defendant claims was prejudicial other-crimes evidence.

¶ 94    First, defendant did not object at trial to L.F.'s testimony about the dogs or about being thrown down the stairs. Thus, the claimed error is forfeited and subject only to plain error review. *Sebby*, 2017 IL 119445, ¶ 48. Before considering either prong of the plain error doctrine, we must find that the error was clear or obvious. *Sebby*, 2017 IL 119445, ¶ 49. In addition, this court reviews a trial court's admission of other-crimes evidence only for an abuse of discretion. *E.g.*, *People v. Baldwin*, 2014 IL App (1st) 121725, ¶ 74.

¶ 95    Second, L.F.'s testimony corroborated the victim's testimony about defendant's threat of and use of force after the sexual assault.[8] While the instrument used to threaten (knife versus dogs) was different, both cases involved threats of force immediately after the sexual assault in order to restrain the victim's movement. Also, L.F.'s testimony about being thrown down the stairs after the sexual assault corroborated the victim's testimony about being thrown from the vehicle after the sexual assault. Both the knife and being thrown from the vehicle were

---

[8]It also corroborated the victim's testimony that she heard dogs in the house.

facts relevant to the aggravated kidnapping charge. Thus, we cannot find a clear and obvious error such that the trial court should have *sua sponte* intervened to halt the testimony.

¶ 96    Defendant also argues that the State undermined the presumption of innocence (1) when it asked a detective if he was assigned to investigate "the rape" of the victim and (2) when it asked defendant about "the last girl you raped." With respect to the latter, an objection to it was immediately sustained by the trial court, and the trial court later instructed the jury to disregard any questions that were withdrawn or to which objections were sustained. *E.g.*, *People v. Lawrence*, 254 Ill. App. 3d 601, 611 (1993) (an improper statement may be cured "by the trial court's sustaining of defense counsel's objection and subsequent instructions to the jury" to disregard it). With respect to the former, defendant has not cited a case where it was error for the State to ask if a detective was assigned to a rape, murder, or robbery investigation. Thus, we do not find this claim persuasive.

¶ 97                                 V. Rebuttal Closing Argument

¶ 98    Defendant claims that certain comments made by the prosecutor during the State's rebuttal closing argument improperly undermined the presumption of innocence.

¶ 99    As we observed above, although the State has wide latitude in both its opening statements and closing arguments and may comment on the evidence, the State may not make comments that have no other purpose than to arouse the prejudices and passions of the jury. *Jones*, 2016 IL App (1st) 141008, ¶ 21; *Herndon*, 2015 IL App (1st) 123375, ¶ 36 (it is improper for a prosecutor to make comments "only *** to inflame the jury's passions"). Even if the remarks were inappropriate, reversal is required only if they engendered such substantial prejudice against the defendant that it is impossible to tell whether the verdict of guilt resulted from them. *Wheeler*, 226 Ill. 2d at 123.

¶ 100   In the case at bar, defendant objects on appeal to seven separate sets of rebuttal comments, and we will discuss each set in turn.

¶ 101                                 A. Defendant's Demeanor

¶ 102   First, defendant argues that it was improper for the prosecutor to comment on defendant's demeanor as he sat listening to the rebuttal closing argument. Defendant contends that the prosecutor could discuss the demeanor presented by defendant during his testimony but not his demeanor as he observed the trial. In support, defendant cites *People v. Foss*, 201 Ill. App. 3d 91, 94 (1990), in which the appellate court found that it was error for the prosecutor to argue in the State's opening statement that the jurors should look at the defendant's reactions during the other witnesses' testimony. The *Foss* court stated: "Defendant's demeanor, in any respect other than when he is testifying, does not constitute evidence in the case." *Foss*, 201 Ill. App. 3d at 95.

¶ 103   In the case at bar, at the end of the State's rebuttal closing argument, the prosecutor concluded by stating:

> "He never thought he'd get caught. He never thought the police would believe [the victim]. [N.L.], or [L.F.] That's why he picked them. He thought he was going to get away with it not once, not twice, but three times. Look at him now. *He's still sitting here smug. He still thinks he's going to get away with it*.

- 20 -

> Tell him he's wrong. Find him guilty. They say a picture is worth a thousand words. That one can be summed up in one and that's guilty." (Emphasis added.)

The words that defendant objects to on appeal are italicized.

¶ 104 The State responds that defendant failed to object at trial to the remarks italicized above and that they are, thus, forfeited for our review. See *Sebby*, 2017 IL 119445, ¶ 48. However, defendant did object to the sentence immediately before the paragraph quoted above, when the prosecutor asked the jurors to look at a photo of defendant and to "[l]ook at that smug, cocky grin" in the photo. Defendant does not need to object to each use of the word "smug" when there is a slight variation in context within just a couple of sentences—particularly when the objection has been overruled. Thus, we find that this error was preserved for our review.

¶ 105 "[C]losing arguments must be viewed in their entirety, and the challenged remarks must be viewed in context." *Wheeler*, 226 Ill. 2d at 122; *People v. Jones*, 2011 IL App (1st) 092529, ¶ 40. When the comments at issue here are viewed in context, it is clear that the prosecutor was asking for justice for the victim. In the immediately preceding lines, the prosecutor argued that defendant had picked victims that he hoped would not be believed, and in the immediately succeeding lines, the prosecutor argued that the jurors should "[t]ell him he's wrong" and "[f]ind him guilty." A prosecutor in closing argument is permitted to exhort the jurors to do their job, and thus, we have repeatedly rejected claims that it was improper for a prosecutor to ask for justice for the victim. See *People v. Trotter*, 2015 IL App (1st) 131096, ¶ 54 (it was not "improper for the State to conclude its closing argument with comments to the jury that 'you now have the power' and that the jurors 'hold in [their] hands the sword of justice,' urging them to sign a guilty verdict form 'holding this defendant responsible for what he did' " to the victim); *People v. Goins*, 2013 IL App (1st) 113201, ¶ 93 ("During closing arguments, the State may denounce the activities of the defendant and urge that justice be administered."); *Jones*, 2011 IL App (1st) 092529, ¶ 42 (the prosecutor's "urging" during closing argument that "the defendant be held accountable for his actions" was not improper). Thus, we cannot find error in the prosecutor's "smug" comments. Even if it was error, we find that this error was harmless.

¶ 106 B. Purported Criminal Profile

¶ 107 Second, defendant claims that the prosecutor created a "purported criminal profile" of a serial rapist when there had been no expert testimony at trial about such a profile.

¶ 108 During the State's rebuttal closing, the prosecutor argued:

> "Do you really think an unsophisticated, uneducated, inarticulate person could pull this off? Serial rapists are smart. They are slick. They can talk a great game, and he is the perfect definition of all those things. He has perfected his craft. He is really good at what he does. All of his crimes are premeditated and calculated."

Defense counsel objected, and the trial court overruled the objection. Thus, this claim is preserved for our review. See *Sebby*, 2017 IL 119445, ¶ 48.

¶ 109 On appeal, defendant claims that the prosecutor created a profile for serial rapists as "smart," "slick," and "talk[ing] a great game." Defendant appears to be arguing that the prosecutor's words created a profile along the lines of a drug courier profile (see *People v. $280,020 in U.S. Currency*, 2013 IL App (1st) 111820, ¶ 28; *People v. Kats*, 2012 IL App (3d) 100683, ¶¶ 31-32), which then needed expert testimony in support. However, the prosecutor

never used the word "profile," and the idea that generic words like "smart" and "slick" constitute a law-enforcement "profile" defies common sense.

¶ 110                                   C. Animal Metaphor

¶ 111    Third, defendant observes that the prosecutor used the word "prey" to refer to defendant's victims, and he argues that the use of this word constitutes an improper "animal metaphor." The prosecutor argued:

> "The defendant is smart, he's sleek, he's suave, and he's strategic. He doesn't look dangerous or menacing, but that's how he gets close to his prey. If he looked dangerous, if he looked violent, if he looked menacing, girls would not engage him in conversation."

Defendant did not object to these remarks at trial, and thus, this claim is forfeited for our review, permitting us to review it only for plain error.

¶ 112    On appeal, defendant argues that, while the prosecutor could have used the word "targets" or "victims," the use of the word "prey" crossed the line. As we observed above, courts have criticized the use of derogatory epithets to describe a defendant, such as " 'cold-blooded criminal[ ]' " (*Jones*, 2016 IL App (1st) 141008, ¶ 6) or " 'crack-head' " (*Deloney*, 359 Ill. App. 3d at 469), and have specifically criticized the use of animal metaphors (see *People v. Johnson*, 208 Ill. 2d 53, 80 (2003) (" 'If you run with the pack, you share the kill.' "); *Johnson*, 119 Ill. 2d at 139 (" '[f]our of those people were butchered by an animal, and that animal is among us today' "); *People v. Ivory*, 333 Ill. App. 3d 505, 517 (2002) (the defendant was " 'just a wolf in sheep's clothing' " and " 'part of a pack of predators' ")).

¶ 113    However, the word "prey" could just as easily refer to a human as to an animal. According to the Merriam-Webster Online Dictionary, the word "prey" has two primary meanings. See Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/prey (last visited Dec. 11, 2019) [https://perma.cc/BDD4-6EEQ]. One meaning refers to an animal; the other refers to both animals and humans. As a noun, the word "prey" means both "an animal taken by a predator as food" and "one that is helpless or unable to resist attack: victim." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/prey (last visited Dec. 11, 2019) [https://perma.cc/BDD4-6EEQ]. The dictionary provides the following example of the proper use of the word: he "was prey to his own appetites." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/prey (last visited Dec. 11, 2019) [https://perma.cc/BDD4-6EEQ]. As this example illustrates, the latter meaning includes humans. As a verb, the word "prey" means both "to seize and devour prey" and "to commit violence or robbery or fraud." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/prey (last visited Dec. 11, 2019) [https://perma.cc/BDD4-6EEQ]. Again, the latter meaning includes humans. Thus, we do not find persuasive defendant's argument that use of this word must be interpreted as referring to an animal. See *People v. Sims*, 403 Ill. App. 3d 9, 21 (2010) (this court found that arguing that the defendant was " 'waiting for his prey' " was not improper); *People v. Nicholas*, 218 Ill. 2d 104, 122 (2005) (prosecutor's comment in closing that defendant's actions were " 'pure evil' " was a permissible comment based on the evidence, in light of the facts that defendant hunted his mother in the street and shot her four times).

## D. Misstated Testimony

Defendant argues that the State attempted to impeach defendant during its rebuttal closing argument with "nonexistent testimony."

The prosecutor argued: "The defendant admitted, by the way, during my cross examination of [defendant], that [the victim's] bag of clothes never came out of his car." Defense counsel objected, stating "[t]hat misstates the evidence," and the trial court overruled the objection. After the trial court's ruling, the prosecutor continued: "That's what he said. So she didn't have her clothes with her."

On appeal, defendant argues that he never made such an admission, thereby making the prosecutor's argument a misstatement of the evidence, and the State admits that the prosecutor misspoke.

The prosecutor's comment in the rebuttal closing was based on the following exchange during the State's cross-examination of defendant:

"Q. And you invited her inside, correct?

A. Yes.

Q. And she came in?

A. Yes.

Q. She didn't bring anything with her? She came in your house, correct?

A. She came in my house, yes."

The last question was a compound question. Defendant repeated the second half of the question, thereby making his subsequent "yes" ambiguous. It is important to remember that the person who transcribed the above and the person who answered were not one and the same. Thus, the choice of a comma to link the "yes" to the preceding phrase, rather than a period which would distance them, was not the choice of the witness. The "[b]y the way" comment in rebuttal closing indicates that the compound nature of the State's question and the resulting ambiguity of defendant's "yes" response were either forgotten by, or understood differently by, both the prosecutor and the trial court that overruled the objection. Given the ambiguity of defendant's response, we cannot find reversible error. This comment did not deprive defendant of a fair trial or prejudice him in any way.

## E. Prostitute Behavior

Defendant argues that the prosecutor offered an "unsworn opinion" about the behavior of prostitutes without supporting evidence or testimony in the record. On appeal, the State concedes that this claimed error was preserved for our review.

At trial, defendant testified that he had paid the victim and another witness as prostitutes. During the State's rebuttal closing, the prosecutor argued:

"ASA: This whole prostitute theory is ridiculous and, frankly, it's insulting your intelligence. And, by the way, prostitutes don't call the police. They usually avoid them—

DEFENSE COUNSEL: Objection, Judge.

THE COURT: Overruled.

ASA: They avoid them like the plague."

¶ 122     On appeal, defendant argues that the prosecutor's comment that prostitutes do not call the police was improper because "no evidence described prostitutes' police-calling habits." In support, he cites *People v. Porter*, 372 Ill. App. 3d 973, 979 (2007), in which the appellate court found that a prosecutor's closing remarks were improper where "[t]here was absolutely no testimony introduced during the trial that drug dealers act in groups and, when they do so, one person holds the drugs, another holds the money, and a third holds the cell phones."

¶ 123     However, we find *Porter* inapposite. Unlike *Porter*, the prosecutor here was not stating the method in which a particular illegal activity was typically transacted. Prosecutors are allowed to draw reasonable inferences from the evidence in the record, and it was reasonable to infer that individuals, who are engaged in illegal activity, would not typically call the police. See *Nicholas*, 218 Ill. 2d at 121 ("In closing, the prosecutor may comment on the evidence and any fair, reasonable inferences it yields ***.").

¶ 124     Defendant also cites in support *People v. Shelton*, 303 Ill. App. 3d 915, 927 (1999), which found that a prosecutor could not argue, without supporting evidence in the record, that codeine and morphine " 'can affect [one's] ability to drive a vehicle safely.' " However, in *People v. Gocmen*, 2018 IL 122388, ¶ 29, the Illinois Supreme Court found: "To the extent that *Shelton* requires expert testimony in every case in which an officer's finding of probable cause is based on his or her inference from the totality of [the] circumstances that the defendant was under the influence of drugs, it is hereby overruled." As a result, we do not find defendant's citation of *Shelton* persuasive.

¶ 125     F. Pit Bulls

¶ 126     Defendant claims that the prosecutor improperly commented on defendant's ownership of pit bull dogs. The State concedes that defendant preserved this issue for our review.

¶ 127     At trial, L.F. testified that defendant ordered his dogs to attack her, but they did not, and that she did not remember what kind of dogs they were. During the subsequent cross examination of defendant, the prosecutor asked, without objection, what breed of dogs defendant owned, and defendant replied "[p]it bull mixes." During the State's rebuttal closing, the prosecutor commented regarding the dogs' breed: "And the dogs, right? [L.F.] told you he tried to sic[ ] his dogs on her. And I asked her, do you know what kind of dogs they were?" Defense counsel objected, and the trial court overruled the objection. The prosecutor continued in the same vein: "None of us knew until he answered that question. I mean, how predictable. *We all knew he was going to say pit bull*." (Emphasis added.) Defense counsel objected again, and the objection was again overruled. The prosecutor kept going: "That's the kind of guy he is. He's violent and he uses his dogs as weapons. *** He will do anything to force these women into submission."

¶ 128     On appeal, defendant argues that the only reason to say "we all knew" was to invoke dislike of this breed and their owners, and he cites in support Ann L. Schiavone, *Real Bite: Legal Realism and Meaningful Rational Basis in Dog Law and Beyond*, 25 Wm. & Mary Bill Rts. J. 65, 111-12 (2016) ("The war on pit bulls, in particular, is characterized by elements of moral panic against the persons who have so long been associated with these dogs—'gang members,' 'drug dealers,' and 'urban youth' ***."). However, the article actually supports the prosecutor's point that, to the extent that defendant's intent was to intimidate his victims, others

would find this breed more intimidating.[9] Thus, we cannot find this comment constituted reversible error, as it did not prejudice defendant and did not deny him a fair trial.

¶ 129                                    G. Mother's House

¶ 130        Lastly, defendant claims that the prosecutor improperly commented on defendant's practice of bringing women to his mother's house before raping them. In its rebuttal closing, the State argued: "And what do you make of the fact that he seems to bring these girls to his mom's house first before raping them? I don't know. It's sick."

¶ 131        In the case at bar, defendant did not testify that he brought N.L. to his mother's house, but he did testify (1) that he drove L.F. and Courtney to his mother's house to drop off Courtney before heading to his own house with L.F. and (2) that he drove C.C. to his mother's house, where they went inside and his mother asked "who was the girl in her house" at 3 a.m. and so they left. Thus, the comment that "he seems to bring these girls to his mom's house first" was based on the evidence.

¶ 132        While the prosecutor's comment that the action was "sick" was gratuitous, it is hard to find reversible error when defendant testified that the reaction of his own mother was that she wanted the girl out of her house.

¶ 133                             VI. Impeachment of Defendant

¶ 134        Defendant argues that the State improperly impeached defendant by asking him if he had told police that N.L. might have lied about being sexually assaulted because she may have been upset by the fact that he struck his girlfriend, Courtney, during sex. Defendant argues that this impeachment was improper because it served to contradict him on a collateral matter. Defendant argues that the State further exacerbated the problem by calling in rebuttal Detective Minter-Edwards to testify concerning defendant's pretrial statement.

¶ 135        At trial, defendant was asked by the State, without objection, whether he had slapped his girlfriend during sex, in front of N.L., and he denied it. Defendant was asked, without objection, whether he had told police that N.L. may have accused him of sexual assault because she may have been upset by the fact that he struck Courtney during sex. Defendant responded by denying that he told anyone that he struck his girlfriend. In rebuttal, the State called Detective Minter-Edwards who testified, without objection, that she asked defendant why N.L. "might be saying he raped her if it weren't true" and defendant "offer[ed] an explanation as to why [N.L.] might be making this up." Defendant told her that N.L. "might be upset because of how he treated [his girlfriend] in that he struck [his girlfriend] while they were having sex."

¶ 136        Since defendant did not object in the court below, the claimed error is forfeited for our review, and we review it only for plain error. See *Sebby*, 2017 IL 119445, ¶ 48. In addition, the proper scope of cross-examination and the admission of rebuttal testimony is generally within the sound discretion of the trial court and is reviewed only for an abuse of discretion. *People v. Reese*, 2017 IL 120011, ¶ 75 ("A trial court's decisions on the admissibility of evidence and the scope of cross-examination *** are reviewed for abuse of discretion."); *People v. Woods*, 2011 IL App (1st) 091959, ¶ 36 (a trial court's decision on what constituted

_____

[9]We do note the irony here that the dogs did not attack, even when ordered to do so, thereby showing that the issue is with the owner, not the breed of dog.

proper rebuttal testimony was reviewed only for an abuse of discretion); *People v. Collins*, 106 Ill. 2d 237, 269 (1985) ("[t]he latitude to be allowed on cross-examination and rebuttal" is "within the sound discretion of the trial court" and reviewed only for an "abuse of discretion").

¶ 137    A trial court abuses its discretion only when its decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it. *People v. Peterson*, 2017 IL 120331, ¶ 125. It is a "highly deferential" standard of review. *Peterson*, 2017 IL 120331, ¶ 125.

¶ 138    On appeal, defendant argues that his own opinion about why a witness would lie was neither impeaching nor relevant. Evidence that "tends to explain, repel, contradict or disprove" the defendant's testimony is generally admissible (*e.g.*, *People v. Daugherty*, 43 Ill. 2d 251, 255 (1969)) and generally found to be "proper rebuttal testimony" (*e.g.*, *Woods*, 2011 IL App (1st) 091959, ¶ 36). Also, prior inconsistent statements are generally admissible as "a vital tool to challenge witness credibility." *People v. White*, 2011 IL App (1st) 092852, ¶ 52.

¶ 139    "However, the cross-examiner may not impeach a witness on a collateral matter; he must accept the witness' answer." *Collins*, 106 Ill. 2d at 269. "The test to be applied in determining if a matter is collateral is whether the matter could be introduced for any purpose other than to contradict." *Collins*, 106 Ill. 2d at 269; *People v. Santos*, 211 Ill. 2d 395, 405 (2004) (" 'A matter is collateral if it is not relevant to a material issue of the case.' " (quoting *Esser v. McIntyre*, 169 Ill. 2d 292, 305 (1996))). "The application of the 'collateral' test, like the latitude allowed in cross-examination and rebuttal, is best left 'largely in the control of the trial court.' " *Collins*, 106 Ill. 2d at 269-70 (quoting 3A John H. Wigmore, Evidence in Trials at Common Law § 1003, at 964 (Chadbourn rev. ed. 1970)).

¶ 140    Defendant characterizes the "matter" that the State sought to impeach as defendant's opinion about N.L.'s veracity. However, the "matter" was defendant's striking of the face, which, according to N.L.'s testimony, was part of both the sex acts and the force used by defendant against her. N.L. testified that defendant raped her, after choking her and striking her in the face. When N.L. started screaming, he called Courtney into the room and told Courtney to slap N.L. in the face, which Courtney did. Defendant and Courtney then engaged in sex, during which defendant slapped Courtney in the face. While defendant and Courtney were having sex, N.L. grabbed a bottle and struck defendant in the head. In response, defendant held N.L. down and told Courtney to start slapping N.L. again, and Courtney hit N.L. in the face.

¶ 141    The only issue at trial was consent. There were no issues about identification since defendant admitted to having sex with the victim, as well as with N.L. and L.F. The sole issues concerned whether defendant obtained sex from the victim through consent and payment, as defendant claimed, or by force and threat of force. Thus, defendant's use of force during sex, in front of a victim, was relevant to the issues at trial. First, defendant's pretrial statement that he struck his girlfriend in connection with sex corroborated N.L.'s testimony that she was also struck by defendant in connection with sex. Second, if defendant's striking of Courtney was bad enough such that defendant thought that it might cause N.L. to fabricate an assault, then the jurors could reasonably infer that such striking was also bad enough to create fear and intimidation in a victim.

¶ 142    In sum, we cannot find that the trial court abused its discretion by not *sua sponte* halting the State's cross-examination of defendant or barring its rebuttal evidence concerning defendant's striking of a woman during sex.

¶ 143    In addition, defendant argues that normally the State would be barred from asking a witness if a State witness was lying and that, in this case, the State was able to obtain this information through the back door. In support, defendant cites *People v. Tolbert*, 323 Ill. App. 3d 793, 809 (2001), in which the appellate court found that the State could ask a defendant whether a witness's testimony was " 'accurate' " or " 'inaccurate' " but not whether the witness's testimony was " 'true.' " The court explained that the State's characterization of statements as accurate or not, or as " 'wrong' " or " 'mistaken' " or not, was permissible because these adjectives include the possibility of a mistake or error and, hence, do not ask the defendant to judge the truthfulness or veracity of the State's witnesses. *Tolbert*, 323 Ill. App. 3d at 809; *People v. Evans*, 373 Ill. App. 3d 948, 963 (2007) (discussing *Tolbert*). "[Q]uestioning a defendant as to the veracity of a prior witness is improper because such questions invade the province of the jury by infringing upon its function to determine the credibility of witnesses." *Evans*, 373 Ill. App. 3d at 961.

¶ 144    In the case at bar, defendant was not asked at trial to comment on the veracity or truthfulness of a prior witness's trial testimony. See *Evans*, 373 Ill. App. 3d at 963 (no error where "the record shows that the prosecutor never asked defendant whether" certain trial witnesses "lied during their testimony"). Defendant was asked "[i]sn't it true" with respect to what he had told the detectives. While his pretrial statement contained his comment on the credibility of N.L.'s accusation, namely, that he denied it, that will generally be the case with a defendant who pleads not guilty to sexual assault. See *Evans*, 373 Ill. App. 3d at 962-63 ("A defendant who testifies in a criminal case and subsequently contradicts testimony of the State's witnesses subjects himself to questions formulated to point out these contradictions."). Thus, we cannot find a clear or obvious error in the trial court's allowing the testimony to proceed without objection.

¶ 145                              VII. One Act, One Crime Rule

¶ 146    Defendant claims that his convictions for both aggravated criminal sexual assault and aggravated criminal sexual abuse violate the one act, one crime rule since they were based on the same act of penetration, and he asks this court to vacate his conviction for aggravated criminal sexual abuse.

¶ 147    Under the one act, one crime rule, multiple convictions are improper if they resulted from the same act. *People v. Burgess*, 2015 IL App (1st) 130657, ¶ 236. Whether a defendant was incorrectly sentenced for multiple offenses based upon the same act is a question of law that this court reviews *de novo*. *Burgess*, 2015 IL App (1st) 130657, ¶ 235. *De novo* consideration means that we perform the same analysis that a trial judge would perform. *Burgess*, 2015 IL App (1st) 130657, ¶ 235. While counsel did not object in the court below, our supreme court has found that any forfeited one act, one crime claims may be reviewed on appeal under the second prong of the plain error rule because they implicate the integrity of the judicial process. *People v. Nunez*, 236 Ill. 2d 488, 493 (2010); *Burgess*, 2015 IL App (1st) 130657, ¶ 235.

¶ 148    In the case at bar, the mittimus demonstrates that the trial court entered convictions on both count V, which charged aggravated criminal sexual assault, and count XIV, which charged aggravated criminal sexual abuse. The indictment shows that both counts alleged the same act, namely, that defendant "knowingly committed an act of sexual penetration upon [the victim], to wit: contact between [his] penis and [her] vagina." At trial, the victim testified about only one act of penetration by defendant's penis into her vagina.

- 27 -

¶ 149 The State agrees that we must vacate the aggravated criminal sexual abuse conviction, and so we vacate it and order the mittimus corrected accordingly. See *People v. Boclair*, 225 Ill. App. 3d 331, 337 (1992) (where the indictment charged the defendant with both aggravated criminal sexual abuse and aggravated criminal sexual assault based on the same physical act of contact between the defendant's penis and the victim's vagina, the sexual abuse conviction must be vacated); see also *Burgess*, 2015 IL App (1st) 130657, ¶ 236 (where the "[d]efendant only sexually penetrated" the victim "one time," and two counts of sexual assault stemmed "from the same act of penetration," one count had to be vacated); *People v. Daniels*, 331 Ill. App. 3d 380, 386 (2002) ("defendant cannot be convicted of two counts of aggravated criminal sexual assault where there was only one act of sexual penetration to one victim"); *People v. Garcia*, 179 Ill. 2d 55, 71 (1997) (when multiple convictions are obtained from a single act of penetration, a sentence should be imposed on the most serious offense and the conviction on the less serious offense should be vacated).

<h2 style="text-align:center">VIII. <em>Zehr</em> Violation</h2>

¶ 151 Defendant asks this court to reverse his conviction because the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) when it asked the jurors whether they "agreed and accepted" the principles set forth in *People v. Zehr*, 103 Ill. 2d 472, 477 (1984), rather than asking whether they understood and accepted them.

¶ 152 Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) provides that, during the pretrial *voir dire* examination of prospective jurors, the trial "court shall ask each potential juror, individually or in a group, whether that juror understands and accepts" the four *Zehr* principles. The four principles are:

> "(1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

See *Zehr*, 103 Ill. 2d at 477. "The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning" these principles. Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 153 We review *de novo* a claim that a trial court committed error when asking "prospective jurors whether they understood" the *Zehr* principles. *People v. Belknap*, 2014 IL 117094, ¶ 41. *De novo* consideration means that we perform the same analysis that a trial judge would perform. *Morrow*, 2019 IL App (1st) 161208, ¶ 61. Defendant concedes that he forfeited this claim for our review, and thus, we will review only for plain error. See *Sebby*, 2017 IL 119445, ¶ 48. The first step of any plain error review is to determine whether a clear or obvious error occurred. *Sebby*, 2017 IL 119445, ¶ 49.

¶ 154 In the case at bar, the trial court instructed prospective jurors prior to asking them individual questions. In particular, the trial court instructed them at length about each of the four *Zehr* principles, stressing that it was "essential" that "each" potential juror "understand *** these fundamental principles":

> "It is absolutely essential as we select this jury that each of you *understand* and embrace these fundamental princip[les], [(1)] that is all persons charged with a crime

are presumed to be innocent. [(2)] And that is the burden of the State who has brought the charges to prove the defendant guilty beyond a reasonable doubt.

[(3)] What this means is that the defendant has no obligation to testify in his own behalf or to call any witnesses in his defense. He may simply sit here and rely upon what he and his lawyers perceive to be the inability of the State to present sufficient evidence to meet their burden of proof. Should that happen, you will have to decide the case on the basis of the evidence presented by the prosecution.

[(4)] The fact that the defendant does not testify must not be considered by you in any way in arriving at your verdict. However, should the defendant elect to testify or should his lawyers present witnesses on his behalf, you are to consider that evidence in the same manner and by the same standards as the evidence presented by the state's attorneys. The bottom line, however, is that there is no burden upon the defendant to prove his innocence. It's the State's burden to prove him guilty beyond a reasonable doubt." (Emphasis added.)

¶ 155    With respect to the four *Zehr* principles, the trial court asked each prospective juror, after first reiterating each principle: "Do you agree with and accept those propositions of law?" Defendant argues that the trial court committed reversible error by substituting "agree with" for "understand."

¶ 156    The supreme court cases of *Belknap*, 2014 IL 117094, and *People v. Wilmington*, 2013 IL 112938, govern the outcome of this issue.

¶ 157    In *Belknap*, the trial court varied its phrasing each time it asked a *Zehr* question, sometimes asking whether there was anyone who did not agree with a principle, sometimes asking if there was anyone who could not accept a principle, and sometimes asking if there was anyone who had " 'any quarrel with that principle.' " *Belknap*, 2014 IL 117094, ¶ 42. The State conceded error, and the supreme court agreed, finding that the trial court erred by failing to ask whether the prospective jurors "understood" the *Zehr* principles. *Belknap*, 2014 IL 117094, ¶ 46. However, the supreme court found that the error did not constitute second-prong plain error, and that it also did not qualify as first-prong plain error either since the evidence was not closely balanced. *Belknap*, 2014 IL 117094, ¶¶ 47, 62 ("not structural error[ ] and therefore not *per se* reversible"; "not closely balanced"). Thus, reversal of the defendant's conviction was not required. *Belknap*, 2014 IL 117094, ¶ 70 (reversing the appellate court which had reversed the defendant's conviction).

¶ 158    In *Wilmington*, 2013 IL 112938, ¶ 28, the trial court, prior to asking individual questions, instructed prospective jurors about the four *Zehr* principles using language that is virtually identical to the language used by the trial court here, which we quoted above (*supra* ¶ 154). As in the case at bar, the trial court in *Wilmington* admonished prospective jurors: " 'It is absolutely essential as we select this jury that each of you *understand* and embrace these fundamental principles ***.' " (Emphasis added.) *Wilmington*, 2013 IL 112938, ¶ 28. When asking questions about the *Zehr* principles, the *Wilmington* trial court asked " 'who disagrees' " with each principle and failed to ask about the fourth principle. *Wilmington*, 2013 IL 112938, ¶ 28. Finding error, our supreme court explained: "While it may be arguable that the court's asking for disagreement, and getting none, is equivalent to juror *acceptance* of the principles, the trial court's failure to ask jurors if they *understood* the four [*Zehr*] principles is error in and of itself." (Emphases in original.) *Wilmington*, 2013 IL 112938, ¶ 32; see also *Belknap*, 2014 IL 117094, ¶ 46 ("it may be arguable that asking jurors whether they disagreed with the [*Zehr*]

principles is tantamount to asking them whether they accepted those principles"). In addition, "the trial court did not even inquire regarding the jury's understanding and acceptance of the principle that defendant's failure to testify could not be held against him." *Wilmington*, 2013 IL 112938, ¶ 32. As in *Belknap*, the *Wilmington* defendant had forfeited the error, and the supreme court found that "the second prong of plain-error review d[id] not provide a basis for excusing defendant's procedural default." *Wilmington*, 2013 IL 112938, ¶ 33. As in *Belknap*, the *Wilmington* court "conclude[d] that the evidence was not closely balanced and thus the first prong of plain-error analysis is unavailing." *Wilmington*, 2013 IL 112938, ¶ 34.

¶ 159    Applying *Belknap* and *Wilmington* to the facts of our case, we find that the trial court committed a clear and obvious error. First, the fact that the trial court informed prospective jurors prior to questioning that it was "essential" that they understood the *Zehr* principles did not cure the trial court's subsequent omission of the word "understood." In *Wilmington*, the trial court used almost the same exact preliminary remarks about the *Zehr* principles that the trial court did here, and the *Wilmington* court still found error with the trial court's subsequent failure to use the word "understood." *Wilmington*, 2013 IL 112938, ¶¶ 28, 32. Second, both *Belknap* and *Wilmington* found that the trial court's failure to use the word "understood," by and of itself, was error, and the trial court in the case at bar failed to use this word in its *Zehr* questions. See *Wilmington*, 2013 IL 112938, ¶ 32 ("the trial court's failure to ask jurors if they *understood* the four [*Zehr*] principles is error in and of itself" (emphasis in original)); *Belknap*, 2014 IL 117094, ¶ 46 ("the trial court's failure to ask whether the jurors understood the principles constitutes error alone"). Third, the trial court here substituted the words "agree with" for "understood." While our supreme court found that it was "arguable that the [trial] court's asking for disagreement, and getting none, is equivalent to juror *acceptance*" (emphasis in original) (*Wilmington*, 2013 IL 112938, ¶ 32), this means that the word "agree" might be a substitute for "accept" but not for "understood." See Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/agree (last visited Dec. 11, 2019) [https://perma.cc/UV2X-FVA4] ("agree" means "to accept or concede something"). Particularly since *Belknap* and *Wilmington* were both decided prior to defendant's November 2015 trial, we find that the trial court committed a clear and obvious error. See also *People v. Dunbar*, 2018 IL App (3d) 150674, ¶ 40 (a trial court's failure to ask whether prospective jurors understood and accepted the *Zehr* principles "constituted clear error for purposes of the plain error doctrine").

¶ 160    Having found a clear and obvious error, we must consider whether the error constitutes plain error under one of the two prongs of the plain error doctrine. As we observed above, our supreme court has found that this type of error does not qualify as second-prong plain error. See *Belknap*, 2014 IL 117094, ¶ 47 ("not structural error[ ] and therefore not *per se* reversible"); *Wilmington*, 2013 IL 112938, ¶ 33. Thus, we next consider the first, or closely balanced prong, of the plain error doctrine.

¶ 161                                IX. Not Closely Balanced

¶ 162    For the reasons stated below, we find that the evidence at trial was not closely balanced.

¶ 163    First, defendant admitted to having sex with 15-year-old C.C., as well as with 16-year-old N.L. and with L.F. Thus, the primary issue at trial was consent.

¶ 164    Second, C.C. testified about a lack of consent, and her testimony was corroborated by her immediate outcry, as shown by the 911 recording and her subsequent hospital visit; by the red jacket and other clothes located in the street; by the detective's and C.C.'s ability to backtrack

from those clothes to defendant's house; by the photo C.C. identified as showing the prints around her neck from when defendant choked her; by the emergency room nurse's testimony that she observed a scratch on C.C.'s neck that was consistent with being strangled; by the paramedic's testimony that, when he arrived on the scene, C.C. was "[c]rying hysterically"; by the police officer's testimony that when she observed C.C. in the back of the ambulance, C.C. appeared "shaken and upset"; and by the testimony of a police detective that, when he observed C.C. in the emergency room, she was "upset" and "crying."

¶ 165    Third, defendant's own testimony corroborated many of the details in C.C.'s testimony, except for those relating to the issue of consent versus force. Defendant admitted at trial that he and a friend, who were in a vehicle, approached C.C. with the intent of obtaining sex. Defendant testified that she told them it was her birthday; that they smoked marijuana together in the vehicle; that they made a couple of stops, including at a restaurant; and that he parked five or six houses away from his own house, as C.C. had testified to. Defendant testified that, after he and C.C. had sex at his house, he dropped her off at a church a short distance from his house, as she had testified to. Defendant testified that she grabbed her bag of clothes from his vehicle and punched him more than once before leaving, as she had testified to.

¶ 166    Fourth, defendant's testimony also corroborated many of the details in L.F.'s and N.L.'s testimony. Defendant testified that he met L.F. at a restaurant after she had lost her job, that L.F. told him that she was walking home and he offered her a ride, that he introduced Courtney as his sister, that they stopped at his mother's house to drop Courtney off, that he locked the door with a key after he and L.F. entered his house, that they had vaginal sex three separate times, that L.F. hit him with a liquor bottle, and that she ran to the front door but could not exit because it was locked—all as L.F. had testified to. With respect to N.L., defendant testified that he met N.L. while he was driving with Courtney and N.L. was walking, that they drove to defendant's home where Courtney locked the door from the inside with a key, and that both defendant and Courtney had sex with N.L.

¶ 167    Fifth, the similarities in the women's testimony were striking. All were out walking, while defendant was in a vehicle. Two were under 18 years old. In all three cases, the women were looking for a ride home, which defendant offered to provide. In all three cases, the door to defendant's home was locked with a key from the inside once they entered. With all three, defendant told them to call him daddy or "Papi," which is Spanish for daddy. Two of the women wound up at a nearby church after the rape. With all three, a 911 call was placed immediately after they escaped. All three cases occurred within a few days from each other.

¶ 168    Sixth, defendant's testimony had inherent problems. Three women, in just six days, all testified that they had been raped by him, under similar circumstances, while he asserted his belief that the sex was all consensual. With respect to N.L., he testified that he believed that everyone had enjoyed themselves and had a good time. The women testified that they did not know each other, and defendant did not claim that they did, thereby eliminating any suggestion of collusion.

¶ 169    For all these reasons, we cannot find that the evidence was closely balanced.

¶ 170                          X. Impeached by a Prior Conviction

¶ 171    Defendant argues that the State improperly impeached him with a "void" 2006 UUWF conviction. Defendant argues that his 2006 UUWF conviction is void because the underlying 2004 felony conviction was for AUUW, which was rendered void by *Aguilar*, 2013 IL 112116.

¶ 172    Defendant admits that he forfeited this issue for our review, and, thus, it may be reviewed only for plain error. Under the plain error doctrine, our first task is to consider whether a clear or obvious error occurred. *Sebby*, 2017 IL 119445, ¶ 49; *Piatkowski*, 225 Ill. 2d at 565.

¶ 173    We cannot find that the claimed error was clear or obvious. In 2015, when defendant's trial was conducted, the law was still in flux, thereby preventing any error from the admission of the conviction from being clear or obvious. That the law was in flux is shown by the fact that our supreme court's decision in 2016 in *People v. McFadden*, 2016 IL 117424, was overruled just two years later in *N.G.*, 2018 IL 121939, ¶ 84.

¶ 174    In 2015, our supreme court had not yet decided how to handle such convictions after *Aguilar*. In 2016, the supreme court did decide how to handle them in *McFadden*, and the trial court at bar committed no error at all under *McFadden*. In *McFadden*, the defendant appealed his UUWF conviction, arguing that "it must be vacated because it was based on" his prior AUUW conviction, which was found "facially unconstitutional" in *Aguilar*. *McFadden*, 2016 IL 117424, ¶ 8. Our supreme court rejected his argument, finding: "Although *Aguilar* may provide a basis for vacating defendant's prior *** AUUW conviction, *Aguilar* did not automatically overturn that judgment of conviction. Thus, at the time defendant committed the [UUWF] offense, defendant had a judgment of conviction that had not been vacated and that made it unlawful for him to possess firearms." *McFadden*, 2016 IL 117424, ¶ 31. Thus, if we had heard defendant's appeal from his 2015 conviction in 2016 or 2017, we would have found no error at all.

¶ 175    Two years later, in *N.G.*, 2018 IL 121939, ¶ 84, our supreme court overruled its decision in *McFadden*, 2016 IL 117424, ¶ 31, finding that "the conviction must be treated by the courts as if it did not exist, and it cannot be used for any purpose under any circumstances." *N.G.*, 2018 IL 121939, ¶ 36. Defendant argues that if his 2015 trial occurred today, he could not be impeached by his 2006 UUWF conviction pursuant to *N.G.*, 2018 IL 121939, ¶ 36. However, that does not mean that this error was clear or obvious at the time of his trial, and we find that it was not. Defendant acknowledges in his brief to this court that the trial judge acted "through no fault of his own."

¶ 176    In addition, we observe that defendant argued in his first supplemental brief that "his convictions are almost certainly void, *pending documentation*." (Emphasis added.) Defense counsel explained that he was aware that, during the 2000s, most AUUW judgments under subsection (a)(1) were also entered under subsection (a)(3)(A), and thus, it was possible that defendant was convicted under a different subsection, making his sentence not void. As a result, defense counsel had requested defendant's 2004 indictment from the clerk of the circuit court since it would state the relevant subsection.

¶ 177    Where his own counsel was not certain that an error occurred without first supplementing the record with additional documentation, we cannot find that the claimed error was clear or obvious.

¶ 178    Even if we were to find a clear or obvious error (which we do not), we cannot find that the evidence at his trial was closely balanced for reasons already explained above or that this error was so serious that it affected the fairness of his trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. See *Sebby*, 2017 IL 119445, ¶ 48.

## XI. Cumulative Error

In his brief and at oral argument, defendant asked us to consider the cumulative error occurring at his trial. However, since we find only one clear trial error, namely, the *Zehr* violation, there is no cumulative error to consider.

## XII. Vacate Prior Convictions

Based on *N.G.*, 2018 IL 121939, defendant argues, and the State agrees, that we must vacate his AUUW conviction, as well as his UUWF conviction, which was based on his AUUW conviction.

In *N.G.*, 2018 IL 121939, ¶ 42, our supreme court found that courts have "an affirmative duty to invalidate" unconstitutional AUUW convictions "and to treat the statute on which it was based as having never existed." Although the supreme court was deciding a termination-of-parental-rights case, it vacated the defendant's AUUW conviction. *N.G.*, 2018 IL 121939, ¶¶ 42, 84 (defendant's unconstitutional "AUUW conviction is null and void").

In *N.G.*, 2018 IL 121939, ¶ 57, our supreme court found that

> "there is no fixed procedural mechanism or forum, nor is there any temporal limitation governing when a void *ab initio* challenge may be asserted. [Citation.] Under our precedent, it is sufficient if a person subject to a conviction premised on a facially invalid statute raises his or her challenge through an appropriate pleading in a court possessing jurisdiction over the parties and the case."

In fact, "the court has an independent duty to vacate the void judgment and may do so *sua sponte*." *N.G.*, 2018 IL 121939, ¶ 57.

"Establishing that a prior conviction is invalid because it was based on a facially unconstitutional statute requires no elaborate fact-finding or hearing. The statutory basis for the conviction can be readily ascertained by retrieval and review of official court records, of which a subsequent court can take judicial notice ***." *N.G.*, 2018 IL 121939, ¶ 58. As a result, "where a person has been convicted under an unconstitutional statute, he or she may obtain relief from any court that otherwise has jurisdiction. The person is not restricted to specific statutory methods for collaterally attacking a judgment." *N.G.*, 2018 IL 121939, ¶ 56.

In the case at bar, defendant supplemented the record with both the mittimus and information (charging document) from his AUUW conviction. In addition, we have his criminal history record, which is a part of his presentencing report in the case before us.

Based on *N.G.*, 2018 IL 121939, we agree with defendant and the State that we must vacate his AUUW conviction, as well as his UUWF conviction, which was based on his AUUW conviction, and we so order them vacated.

## XIII. Resentencing

Because of his now vacated convictions, defendant also seeks a resentencing in the case at bar.

Generally, a sentence within the statutory limits is reviewed only for an abuse of discretion. *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 122. We owe great deference to the trial court's sentencing determination since the trial court, which heard the witnesses and observed the evidence first-hand, is in the best position to determine the appropriate sentence. See *Harmon*, 2015 IL App (1st) 122345, ¶ 122. "So long as the trial court does not consider

incompetent evidence or improper aggravating factors, or ignore pertinent mitigating factors, it has wide latitude in sentencing a defendant to any term within the applicable statutory range." *Harmon*, 2015 IL App (1st) 122345, ¶ 122.

¶ 191 Defendant argues that the trial court specifically considered these two convictions at sentencing, and the State argues that the transcript of the sentencing hearing shows otherwise.

¶ 192 At the sentencing hearing, Detective Minter-Edwards testified that, on April 1, 2009, she and her partner, Detective Ghoulston, began to investigate an aggravated criminal sexual assault against M.S. by defendant. During an interview, M.S. stated that defendant took her to a music store; that she wanted to leave; that they left when he became upset and they went into a vehicle; that he punched her in the face and sexually assaulted her vaginally, anally, and orally; that he told her to lick his anus; that he ordered her to call him "Daddy"; and that, after an "outcry the next morning," she was taken to a hospital where a criminal sexual assault kit was performed. The detective was later informed by the Illinois State Police Crime Lab that DNA obtained from the anal swabs of M.S. matched defendant's DNA. M.S. subsequently identified defendant as her attacker, and he was charged in a case that is still pending.

¶ 193 Detective Minter-Edwards further testified that she and her partner also investigated a sexual assault on A.W. on February 10, 2009. During an interview, A.W. stated that she was walking down the street when defendant offered her a ride and she accepted; that he wanted sex and she refused; that he vaginally raped her and she escaped out of the vehicle; and that she ran into a store and reported it immediately. A.W. was treated at a hospital where a criminal sexual assault kit was performed. The detective later learned from the Illinois State Police Crime Lab that DNA obtained from the vaginal swabs of A.W. matched defendant's DNA. However, A.W. refused to prosecute, and defendant was not charged.

¶ 194 Detective Minter-Edwards testified that, while she was investigating the cases of A.W., N.L., and L.F., she reviewed reports concerning defendant authored by other detectives. One of the cases that she reviewed concerned a sexual assault by defendant of M.C. on September 30, 2009. M.C. stated that she and defendant were acquaintances; that defendant sexually assaulted her in a stairwell, forcing her to perform oral sex; that, after she complied, he vaginally and digitally raped her; and that she reported the assault at the first opportunity. M.C. was treated at a hospital where a criminal sexual assault kit was performed. The Illinois State Police later reported that DNA from M.C.'s anal swabs matched defendant's DNA. However, that case was rejected by the state's attorney's office, and defendant was not charged. Since the case was rejected, the trial court ruled that it would "not consider" M.C.'s case as "any form of aggravation."

¶ 195 The State agreed to stipulate that M.S. believed that her child was born out of the assault by defendant. On cross, Detective Minter-Edwards testified she had a buccal swab performed on the child and it was not his child.

¶ 196 The prosecutor then read aloud a victim impact statement from C.C., who was present in court. In the statement, C.C. stated that she had not been the same since the rape; that she did not start going back outside until almost a year later; and that, every year, her birthday causes her to cry.

¶ 197 The prosecutor then reviewed defendant's criminal record, noting that, as an adult, he had one 2008 misdemeanor and the two prior weapons convictions, in 2004 and 2006. The prosecutor argued that "the most important" factor to consider was whether defendant was a danger to society. The prosecutor argued that defendant was a serial rapist, observing that

N.L.'s and L.F.'s cases were still pending, that the judge had heard both of them testify at trial, and that the court had also heard Detective Minter-Edwards's testimony about multiple other victims.

¶ 198 Defense counsel argued that defendant never knew his father, that he was sexually molested at a young age, and that he had problems with alcohol and marijuana. When defendant addressed the court, defendant stated that he realized that "[i]nstead of trying to convince [these women] to have sex, I should have been using my influence to uplift these young women." He stated that he was perpetuating the "cycle that [he] was born into" and that, after being sexually molested as a young child by a man, he sought to confirm his sexuality by sex with multiple women.

¶ 199 Before sentencing defendant, the trial court observed:

"The fact of the matter is you have an extensive criminal background and your conduct in this case as well as in case number *** with the victim in that case which the State used in aggravation in this case contributed—contributed to the idea that the public absolutely needs to be protected from you."

¶ 200 The trial court then made "a specific finding" that there was a need "to protect the public," specifically that defendant is "a danger to society and society needs to be protected from" him. The trial court sentenced defendant to a total of 70 years with IDOC.

¶ 201 On appeal, defendant argues that the trial court's comment about his "extensive criminal background" was a reference to his two prior weapons convictions. Defendant argues that, other than a juvenile conviction and a misdemeanor conviction, his entire "criminal background" consisted only of those two prior convictions. This argument ignores all the testimony introduced in this case showing that defendant was a serial rapist. When the court used the word "extensive" and found that the public absolutely needed to be protected from defendant, it was clear that it was not referring to the two weapons convictions but to the testimony in this case about multiple sexual assaults against multiple victims.[10]

¶ 202 However, since the State did refer to the now vacated convictions at sentencing, we believe it is more prudent to remand for a resentencing, where the trial court may impose the same sentence or a different one.

¶ 203 CONCLUSION

¶ 204 For the foregoing reasons, we vacate defendant's conviction in this case for aggravated criminal sexual abuse as a violation of the one act, one crime rule and order the mittimus corrected accordingly. We affirm all his other convictions in this case, but we remand for resentencing.

¶ 205 In addition, we vacate his prior AUUW conviction, as well as his prior UUWF conviction, as required by our supreme court's decision in *N.G.*, 2018 IL 121939.

¶ 206 Affirmed in part and vacated in part; cause remanded for resentencing with directions.

---

[10]In his brief to this court, defendant repeatedly argues that the trial court referred to defendant's criminal "record." However, the court did not use the term "record" but the more general term "background."

¶ 207    JUSTICE LAMPKIN, specially concurring:

¶ 208    To be perfectly clear, I concur only in the result reached by the majority. I do not concur in the reasoning employed by the majority to reach that result.